J-A28015-15

2015 PA Super 244

IN RE: BABY S. : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
APPEAL OF: S.S. : No. 1259 EDA 2015

Appeal from the Order Entered April 23, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2014-X2543

BEFORE: GANTMAN, P.J., PANELLA, J., and SHOGAN, J.

OPINION BY GANTMAN, P.J.: **FILED NOVEMBER 23, 2015**

Appellant, S.S., appeals from the order entered in the Montgomery County Court of Common Pleas, which confirmed Appellant as the legal mother of Appellee Baby S., and found Appellant had breached the terms of her surrogacy contract with L.S., the biological father of Baby S., and J.B., the gestational carrier of Baby S. We affirm.

The relevant facts and procedural history of this appeal are as follows. Appellant and L.S. were married in August 2011. They decided to have a child, and Appellant underwent fertility treatments. Appellant and L.S. ultimately agreed to use a gestational carrier. In 2012, they contacted Reproductive Possibilities, a New Jersey company that offers services to individuals and couples who wish to have children with the use of assisted reproductive technology. Reproductive Possibilities facilitates and coordinates gestational carrier arrangements for its clients. Melissa Brisman, an attorney who is the sole owner of Reproductive Possibilities, met

with Appellant and L.S. to discuss the option of gestational surrogacy. Appellant and L.S. signed a service agreement with Reproductive Possibilities on November 8, 2012. The service agreement identified Appellant and L.S. as "Intended Parents" and provided in part as follows:

> Intended Parents desire to have a child or children. Intended Parents have decided to retain Reproductive Possibilities to assist them in selecting, coordinating and assisting to screen a Gestational Carrier who will carry and bear a child conceived from embryos belonging to Intended Parents, and to help Intended Parents navigate their journey through the gestational carrier process.
>
> *   *   *
>
> Intended Parents may terminate this Agreement in writing at any time for any reason, provided the Gestational Carrier has not undergone the IVF/Embryo Transfer. If the Gestational Carrier has already undergone the IVF/Embryo Transfer and Intended Parents wish to terminate this Agreement, they may only do so once it is confirmed that Gestational Carrier is NOT pregnant.

(N.T. Hearing, 3/11/15, Exhibit RL-1; Supp. R.R. at 17a, 25a). Appellant and L.S. also hired Attorney Brisman to represent them during the surrogacy process. Appellant told Attorney Brisman she wanted a gestational carrier in a state where Appellant could be named the mother on the child's birth certificate without having to adopt the child. Attorney Brisman has handled numerous surrogacy cases in approximately twenty to thirty counties in Pennsylvania, and she advised a formal adoption would be unnecessary under Pennsylvania law in this context.

J.B. resides in Pennsylvania and had previously served as a gestational

carrier for another couple.  She applied to be a surrogate again in 2012 and Reproductive Possibilities matched her with Appellant and L.S.  In an email sent to J.B. on November 8, 2012, Appellant stated:

> [L.S.] and I have wanted a child since we started dating four years ago.  I come from a family of three, and the memories I share with my sisters, I will have for a lifetime.  [My child, J.S.,] absolutely fulfills me, but I do long for another child to contribute to the laughter and love of our family.
>
> I am a person who can appreciate the magnitude of what a gestational carrier will be doing for us.  It really is a miracle that something like this can actually take place; that you are willing to work with a couple you don't even know to conceive a baby and carry that baby and nurture it for 40 weeks for us.  …  Once the baby arrives, I expect to stay in touch; however, I don't expect the communication to be as often as it would during the pregnancy.  I would probably reach out a few times a year and send pictures of the child.

(N.T. Hearing, Exhibit P-1; Supp. R.R. at 36a).  On May 14, 2013, Appellant and L.S. entered into a service agreement with an egg donation agency called Tiny Treasures.  The agreement referred to Appellant and L.S. as "Intended Parents" and stated in part:

> Intended Parents desire to have a child or children related to them and the Intended Parents are unable to produce viable eggs of their own and/or it is inadvisable for the Intended Parents to use their own eggs to achieve a pregnancy due to a genetically or medically related condition.
>
> *  *  *
>
> [] Intended Parents desire to retain the services of Tiny Treasures, LLC, and Tiny Treasures, LLC desires to provide the Intended parents with its services of locating an Egg

Donor and other services as provided in this Agreement for the express purpose of egg donation.

(N.T. Hearing, Exhibit RL-2; Supp. R.R. at 37a). Appellant and L.S. ultimately executed an ovum donation agreement with an anonymous donor selected through Tiny Treasures. The ovum donation agreement provided in part as follows:

The sole purpose of this Agreement is to enable Intended Mother and Intended Father to have a child by means of in vitro fertilization using ova donated by Donor and semen from the Intended Father or a sperm donor. …

* * *

[] The Parties understand that the Intended Parents have spent many years, suffered much pain and agony to bring a Child into their family and are now relying greatly on Donor to help produce a Child.

* * *

Intended Parents warrant that they have discussed the implications of parenting a Child conceived by ovum donation, and that they are comfortable and knowledgeable regarding such implications.

* * *

Donor agrees that the Intended Mother shall enter her name as the mother and Intended Father shall enter his name as the father on the birth certificate of any Child born from such Donated Ova. Donor further agrees that it is in the best interests of the Child that she not attempt to assert her maternity by any means, including a maternity action or otherwise, or attempt to form a parent-child relationship with the Child.

Donor understands that the Intended Parents shall be conclusively presumed to be the legal parents of any Child conceived pursuant to this Agreement. Donor shall not

have any parental rights. Intended Parents shall take parental responsibility and custody of any Child conceived pursuant to this Agreement, immediately after birth, regardless of whether the Child suffers from any physical or mental disease or defect.

(N.T. Hearing, Exhibit RL-4; Supp. R.R. at 49a-71a). Having selected an egg donor, Appellant, L.S., and J.B. entered into a gestational carrier contract on September 12, 2013. The contract identified Appellant (S.S.) and L.S. as the intended mother and father respectively, and J.B. as the gestational carrier, and provided in part as follows:

[] Intended Mother…wishes to be the mother of a child who is biologically related to her husband….

\* \* \*

[T]he Parties mutually agree as follows:

\* \* \*

It is the intention of the Gestational Carrier that she is entering into this Agreement to bear a Child for the Intended Parents and not for the purpose of having a Child who the Gestational Carrier will raise or with whom she will have a legal relationship.

[] The Intended Parents agree to begin working on declaring their legal parentage by the twentieth (20th) week of pregnancy and agree to accept custody and legal parentage of any Child born pursuant to this Agreement. … The Gestational Carrier shall have no parental or custodial rights or obligations of any Child conceived pursuant to the terms of this Agreement….

\* \* \*

[T]he Intended Parents agree to assume legal responsibility for any Child born pursuant to this Agreement as long as the Parties otherwise comply with

the terms of this Agreement….

(N.T. Hearing, Exhibit P-2; R.R. at 20a-42a).  The contract further provided that Appellant or L.S. could terminate the agreement under certain conditions but not after J.B. became pregnant in the manner described. Additionally, the contract contained provisions directing Appellant and L.S. to compensate J.B. for certain expenses associated with the surrogacy process and pregnancy.  Appellant paid over $100,000.00 to cover those expenses and L.S. contributed a $5,000.00 payment.

J.B. underwent an embryo transfer procedure on November 7, 2013. The embryo was created from the sperm of L.S. and an egg from the anonymous donor and was implanted in J.B.'s uterus.  Appellant and L.S. were present for the procedure and repeatedly thanked J.B. for agreeing to carry their baby.  The embryo transfer was successful, and J.B.'s pregnancy was confirmed on November 18, 2013.  In preparation to raise another child, Appellant and L.S. moved from their New York City brownstone to a five-bedroom house in New Jersey.  During the pregnancy, Appellant and L.S. communicated with J.B. through phone calls, e-mails, and text messages. In March 2014, J.B. had a twenty-week ultrasound, which Appellant and L.S. attended.  Appellant and L.S. again expressed their gratitude to J.B., and J.B. described the meeting as positive.  At no time did Appellant indicate to J.B. that Appellant did not intend to be the mother of Baby S.

In April 2014, Attorney Brisman began preparations to obtain a court

- 6 -

order designating Appellant and L.S. as the parents of Baby S. on the child's birth certificate, pursuant to the Pennsylvania Department of Health ("DOH") policy and procedures regarding assisted conception birth registrations.[1] Appellant, however, refused to sign the relevant paperwork because Appellant and L.S. were then having marital difficulties. Appellant sent an email to an employee at Reproductive Possibilities on April 15, 2015, in which she stated, "[L.S.] and I are trying to figure out how we can best co-parent [Baby S.] in the wake of our irreconcilable differences." (N.T. Hearing, Exhibit RL-8; Supp. R.R. at 72a). Due to Appellant's refusal to cooperate and her intent to seek a divorce, Attorney Brisman did not attempt to obtain a pre-birth court order naming Appellant and L.S. as the legal parents of Baby S. Attorney Brisman ultimately withdrew her representation of Appellant and L.S.

On July 17, 2014, while still pregnant with Baby S., J.B. filed a petition for "Assisted Conception Birth Registration and to Establish Parentage," which sought a court order declaring Appellant and L.S. the legal parents of Baby S. The petition also requested the court order to direct the DOH to

---

[1] At the hearing on J.B.'s petition, the guardian *ad litem* introduced a 2004 memorandum from the DOH outlining the procedure in assisted conception births for placing the names of the intended parents on the baby's birth certificate. The memorandum stated the intended parents must submit to the DOH Division of Vital Records several documents, including (1) a court order stating that any certified copies of the birth certificate shall list the intended mother and father as the child's parents and (2) a supplemental report of assisted conception containing information from the intended parents. (**See** N.T. Hearing, Exhibit GAL-2; Supp. R.R. at 175a-178a).

issue a birth certificate which named Appellant and L.S. as the parents. The court subsequently granted J.B.'s motion to amend the petition to include a count for counsel fees against Appellant.

J.B. gave birth to Baby S. at Doylestown Hospital on August 5, 2014. J.B. was named as the mother on Baby S.'s birth certificate and no name appeared for the father. L.S and Baby S. subsequently moved to California, where L.S. lived before his marriage to Appellant. L.S. applied for medical assistance from the state of California because Appellant did not add Baby S. to her health insurance policy. J.B. received a bill from the Children's Hospital of Philadelphia for the aftercare of Baby S. J.B. also stated she has been contacted by the state of California regarding her potential liability for child support.

Appellant filed a response with new matter to J.B.'s petition on August 12, 2014, in which she claimed the parties' gestational carrier contract was unenforceable.[2] On September 2, 2014, L.S. filed responsive pleadings to J.B.'s petition and Appellant's new matter, as well as a counterclaim against Appellant for breach of contract, specific performance and counsel fees. The guardian *ad litem* for Baby S. also filed responsive pleadings to J.B.'s petition and to Appellant's new matter.

Following two days of hearings on March 11, 2015, and April 21, 2015, the court entered an order on April 21, 2015, which declared Appellant and

---

[2] Appellant also alleged L.S. induced her to sign the contract through fraud and duress but later abandoned those claims.

L.S. as the legal parents of Baby S. and authorized the DOH to issue an amended birth certificate in accordance with the order. The court further found Appellant had breached the gestational carrier contract and was liable for J.B.'s legal expenses under the terms of the contract. On April 23, 2015, the court entered an amended order to correct the birthdate of Baby S. The court issued a second amended order on May 4, 2015, which added Appellant's birth name (initials). Appellant filed a timely notice of appeal and a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(a)(2)(i).

Appellant raises the following issues for our review:

> WHETHER THE PROVISIONS OF THE SURROGACY AGREEMENT BETWEEN THE PARTIES ATTEMPTING TO CREATE PARENTAGE OF A CHILD BY CONTRACT ARE VALID AND ENFORCEABLE UNDER PENNSYLVANIA LAW?
>
> WHETHER PENNSYLVANIA SHOULD RECOGNIZE THE PRINCIPLE OF "MATERNITY BY ESTOPPEL"?

In her first issue, Appellant argues the Pennsylvania legislature has declined to enact any law recognizing the validity of surrogacy agreements, despite its consideration of a bill introduced in 2005 that addressed the issue. Appellant contends this legislative inaction illustrates the legislature's "distinct reluctance" to recognize surrogacy agreements as binding and enforceable. Appellant asserts the DOH policy regarding assisted conception birth registration lacks the force or effect of law and is intended merely as guidance in cases in which all parties agree on the issue of parentage.

Appellant further claims that no judicial decision in the Commonwealth has sanctioned surrogacy agreements, and the trial court's reliance on **Ferguson v. McKiernan**, 596 Pa. 78, 940 A.2d 1236 (2007), is misplaced because the Supreme Court did not address the issue of whether parentage can be established *via* contract. Appellant also distinguishes **J.F. v. D.B.**, 897 A.2d 1261 (Pa.Super. 2006), *appeal denied*, 589 Pa. 739, 909 A.2d 1290 (2006), as involving only the issue of whether a gestational carrier, with no genetic relation to the triplets she birthed, had standing to seek custody of the babies. Appellant submits the **J.F.** Court refused to address the validity of the surrogacy contract at issue as "[t]hat task is for the legislature." **See** Appellant's Brief at 13 (quoting **J.F., supra** at 1265). Appellant supports her position with case law from states which have declared surrogacy contracts void and unenforceable.

Appellant argues Pennsylvania law provides only two ways for a person to establish parentage—by genetics/biology or by adoption—and neither situation applies to Appellant. Appellant claims Pennsylvania law does not provide for parentage by contract, and this Court has no authority to create a new method to establish parentage. Appellant asserts the surrogacy contract at issue was an unlawful means of circumventing the statutory adoption procedure, which was the sole route available for Appellant to be declared a legal parent of Baby S. Appellant insists J.B. is the legal mother of Baby S. and a court would have to terminate J.B.'s parental rights

pursuant to the Adoption Act[3] for any adoption of Baby S. to occur. Appellant further contends the contract impermissibly provided for compensation to J.B. for releasing custody of Baby S. Alternatively, Appellant argues that if J.B. had no parental rights to relinquish then Appellant could not have fulfilled her contractual responsibilities to become Baby S.'s legal mother under the doctrine of impossibility of performance. Appellant claims the contract violates public policy because it purports to create a child-parent relationship without an adoption or judicial oversight, in direct conflict with Pennsylvania law. Appellant concludes the surrogacy contract is void and unenforceable as against public policy, and this Court should determine that Appellant is not the legal mother of Baby S. We disagree.

The issue of whether a contract is void as against public policy presents a question of law, and our standard of review is plenary. *See Ridley ex rel. Ridley v. State Farm Mut. Auto. Ins. Co.*, 745 A.2d 7, 9 (Pa.Super. 1999), *appeal denied*, 572 Pa. 708, 813 A.2d 843 (2002). "Generally, a clear and unambiguous contract provision must be given its plain meaning unless to do so would be contrary to a clearly expressed public policy." *Eichelman v. Nationwide Ins. Co.*, 551 Pa. 558, 563, 711 A.2d 1006, 1008 (1998).

> Whether a cause of action or claim for relief is repugnant
> to public policy implicates certain standards:

---

[3] 23 Pa.C.S.A. §§ 2101-2938.

In our judicial system the power of courts to formulate pronouncements of public policy is sharply restricted; otherwise they would become judicial legislatures rather than instrumentalities for the interpretation of law. Generally speaking, the Legislature is the body to declare the public policy of a state and to ordain changes therein…. This is peculiarly so where a matter of expediency is up for consideration…. In many cases, on questions of good morals, as opposed to mere expediency, the courts may declare and apply the public policy of the State; …again, where an alteration in public policy on any point of general interest has actually taken place, and is indicated by long-continued change of conduct on the part of the people affected, when such a change has become practically universal, the courts may recognize this fact and declare the governing public policy accordingly…. But neither of these rules controls the…case…where no question of morality is involved; it is purely one of expediency; and no gradual or universal change of customary practice has occurred. Public policy in the administration of the law by the court is essentially different from what may be public policy in the view of the legislature. With the legislature it may be, and often is, nothing more than expediency. The public policy which dictates the enactment of a law is determined by the wisdom of the legislature. Public policy…with the latter [the legislature] may be, and often is, nothing more than expediency; but with the former [the courts], it must, and may only, be a reliance upon consistency with sound policy and good morals as to the consideration or thing to be done.

The right of a court to declare what is or is not in accord with public policy does not extend to specific economic or social problems which are controversial in nature and capable of solution only as the result of a study of various factors and conditions. It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a

court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public [well-being]. Familiar illustrations are those involving unreasonable restraints of marriage or of trade, collusive arrangements for obtaining divorces, suppression of bids for public contracts, interference with freedom of conscience or religion. If, in the domain of economic and social controversies, a court were, under the guise of the application of the doctrine of public policy, in effect to enact provisions which it might consider expedient and desirable, such action would be nothing short of judicial legislation, and each such court would be creating positive laws according to the particular views and idiosyncrasies of its members. Only in the clearest cases, therefore, may a court make an alleged public policy the basis of judicial decision.

The standard for deciding a case on strict public policy grounds is unquestionably high.

*Olympus Corp. v. Canady*, 962 A.2d 671, 675-76 (Pa.Super. 2008)

(internal citations omitted). When assessing whether a contract violates

public policy:

[T]his Court is mindful that public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract.

Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy…. Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental

- 13 -

> practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts…contrary to public policy. The courts must be content to await legislative action. …
>
> It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring [that the contract is against public policy].

*Ferguson, supra* at 93 n.16, 940 A.2d at 1245 n.16 (quoting *Eichelman, supra* at 563, 711 A.2d at 1008) (internal citations omitted). *See also Shick v. Shirey*, 552 Pa. 590, 716 A.2d 1231 (1998) (recognizing independent authority of courts to discern public policy in absence of legislation but rejecting claim that legislature's failure to amend Workers' Compensation Act to include provisions for filing claim for retaliatory discharge rendered Court powerless to recognize that cause of action; stating: "No sound analysis can be drawn from legislative silence. An equally compelling argument may be made that the legislature has not perceived that retaliatory discharge for filing of workers' compensation claims has become such a pervasive problem that it requires the experience of an administrative agency"); *J.F., supra* at 1279 (stating: "Only in the clearest of cases may a court declare a contract void as against public policy").

The *Ferguson* Court found binding and enforceable an oral agreement between a mother and a sperm donor (who previously was in a relationship

- 14 -

with the mother), according to which the sperm donor agreed to surrender all rights to the children arising from his biological paternity in return for his release from any attendant support obligations. *Ferguson, supra*. The Court rejected the mother's claim that the contract violated public policy, characterizing her claim as "unsustainable in the face of the evolving role played by alternative reproductive technologies in contemporary American society." *Id.* at 93, 940 A.2d at 1245.

> It derives no authority from apposite Pennsylvania law, and it violates the commonsense distinction between reproduction via sexual intercourse and the non-sexual clinical options for conception that are increasingly common in the modern reproductive environment. The inescapable reality is that all manner of arrangements involving the donation of sperm or eggs abound in contemporary society, many of them couched in contracts or agreements of varying degrees of formality. An increasing number of would-be mothers who find themselves either unable or unwilling to conceive and raise children in the context of marriage are turning to donor arrangements to enable them to enjoy the privilege of raising a child or children, a development neither our citizens nor their General Assembly have chosen to proscribe despite its growing pervasiveness.

*Id.* (internal citation and footnote omitted). Our Supreme Court further stated:

> [W]e cannot agree with the [trial court and Superior Court] that the agreement here at issue is contrary to the sort of manifest, widespread public policy that generally animates the courts' determination that a contract is unenforceable. The absence of a legislative mandate coupled to the constantly evolving science of reproductive technology and the other considerations highlighted above illustrate the very opposite of unanimity with regard to the legal relationships arising from sperm donation, whether

- 15 -

anonymous or otherwise. This undermines any suggestion that the agreement at issue violates a dominant public policy or obvious ethical or moral standards…demonstrating a virtual unanimity of opinion…sufficient to warrant the invalidation of an otherwise binding agreement.

*Id.* at 97, 940 A.2d at 1248 (internal citations and quotation marks omitted). The Court also observed that but for the parties' agreement, the children would not have been born. **See id.** **See also J.F., supra** (declining to address validity of surrogacy contract but holding gestational carrier without biological connection to children was not children's legal mother and had no standing to challenge biological father's right to custody).

Instantly, the trial court reasoned as follows:

We can state, without any hesitation, that the contract here at issue must be enforced. The parties all had the benefit of able counsel before entering into it. Every detail of the process was spelled out to the nth degree. Everything proceeded according to plan until the marriage of L.S. and [Appellant] unraveled. Baby S. is in the world only because of this and the other related contracts which [Appellant] signed willingly and voluntarily. Indeed, it was, for the most part, [Appellant's] assets that enabled this baby to be created and delivered.

\* \* \*

[W]e will not presume to declare the Commonwealth's public policy on the issue at hand. Indeed, as pointed out by counsel for L.S. and J.B. as well as by the guardian *ad litem*, the closest thing we have to a "long governmental practice"—a phrase used by the Supreme Court in the **Ferguson** case—on the topic is the [DOH's] 20-year old directive designed to facilitate assisted conception birth registrations. That this administrative procedure exists

- 16 -

> and courts in the Commonwealth routinely enter orders that authorize the issuance of birth certificates for children born as a result of alternate reproductive technologies would clearly militate against a finding that surrogacy contracts violate public policy. Instead, we determine that the parties to this contract must be held to its terms. While we have no power to force [Appellant] to assume her role as mother and participate fully in all aspects of Baby S.'s life, we can impose upon her the role of legal mother with, at least, the financial responsibilities that entails.

(Trial Court Opinion, filed May 28, 2015, at 10, 14). We agree with the court's analysis. Appellant does not dispute that she freely entered into the gestational carrier contract and related agreements, which unambiguously stated that she and L.S. were the intended legal parents of Baby S. Those agreements made clear J.B. would have no parental rights or obligations with respect to Baby S., and J.B.'s sole role was that of a gestational carrier. In the year leading up to the pregnancy and for months after the pregnancy was confirmed, Appellant's actions were consistent with her declared intention to be Baby S.'s mother. Baby S. would not have been born but for Appellant's actions and express agreement to be the child's legal mother. **See Ferguson, supra**.

Appellant failed to meet her burden to show the gestational carrier contract is contrary to public policy in Pennsylvania. Despite Appellant's emphasis on the fact that no statute recognizes the validity of surrogacy agreements, the absence of a legislative mandate one way or the other "undermines any suggestion that the agreement at issue violates a dominant

public policy or obvious ethical or moral standards…demonstrating a virtual unanimity of opinion…sufficient to warrant the invalidation of an otherwise binding agreement." *See id.* at 97, 940 A.2d at 1248; *Shick, supra*.

Moreover, case law from the past decade reflects a growing acceptance of alternative reproductive arrangements in the Commonwealth. The *Ferguson* Court expressly recognized the enforceability of a contract that addressed parental rights and obligations in the context of assisted reproductive technology, which in that case involved sperm donation. *See id.* The Court acknowledged "the evolving role played by alternative reproductive technologies in contemporary American society." *Id.* at 93, 940 A.2d at 1245. The Court acknowledged "non-sexual clinical options for conception…are increasingly common in the modern reproductive environment" and noted that the legislature had not prohibited donor arrangements despite their "growing pervasiveness." *Id.* The Court's language and focus on the parties' intent is at odds with Appellant's position that gestational carrier contracts, a common non-sexual clinical option for conceiving a child, violate a dominant public policy based on a "virtual unanimity of opinion." *See id.* Appellant's claim is further undercut by the long-established DOH procedure for placing the intended parents' names on a child's birth certificate when a gestational carrier is used, and the testimony of Attorney Brisman, who has successfully used the DOH procedure hundreds of times in Pennsylvania.

Appellant is incorrect to propose she could become the legal mother of Baby S. only through a formal adoption, which would require termination of J.B.'s parental rights. Acting solely as the gestational carrier, J.B. was not the biological mother of Baby S. ***See J.F., supra***. Therefore, J.B. had no parental rights to Baby S. and none to relinquish under the Adoption Act. ***See*** 23 Pa.C.S.A. § 2502. J.B. was named on the birth certificate as a ministerial act precisely because Appellant had reneged on the surrogacy contract.

Further, the Adoption Act is not the exclusive means by which an individual with no genetic connection to a child can become the child's legal parent; and nothing in the Adoption Act evinces a "dominant public policy" against the enforcement of gestational carrier contracts. The legislature has taken no action against surrogacy agreements despite the increase in common use along with a DOH policy to ensure the intended parents acquire the status of legal parents in gestational carrier arrangements. Absent an established public policy to void the gestational carrier contract at issue, the contract remains binding and enforceable against Appellant. ***See Eichelman, supra***. Accordingly, we affirm.[4]

Order affirmed.

---

[4] Due to our disposition, we decline to address Appellant's second issue regarding the principle of "maternity by estoppel."

- 19 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/23/2015