J-A26012-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CHANEL GLOVER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICOLE JUNIOR | : | No. 1369 EDA 2022 |

Appeal from the Order Entered May 4, 2022
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s):  D22048480

BEFORE:  BOWES, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED FEBRUARY 24, 2023**

Chanel Glover (Glover) appeals from the order entered in the Court of Common Pleas of Philadelphia County (trial court) granting the petitions filed by her former spouse Nicole Junior (Junior) seeking the pre-birth establishment of parentage of the child (Child) conceived through invitro fertilization (IVF) treatment during their marriage.  Because we disagree with the trial court's conclusion that Junior's parentage was established by contract, we reverse its order in its entirety.

_____

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

**A.**

The relevant facts and procedural history of this case are as follows. Glover and Junior, a same-sex couple, were married in San Bernadino, California in January 2021. They decided to pursue IVF treatment and moved to Philadelphia shortly thereafter to be closer to family. The couple initiated the IVF process through RMA Fertility Clinic and Glover's eggs were retrieved in preparation for fertilization by a sperm donor.

In February 2021, Glover entered into an agreement with Fairfax Cryobank for donated sperm and she was the sole signatory to the contract. (*See* Fairfax Cryobank Agreement, 2/03/21, at 5). In the agreement, Glover is listed as the "Intended Parent" and she is referred to throughout the document as "the Client"; Junior is listed as the "Co-Intended Parent." (*Id.* at 1). The contract includes a provision addressing the "Legal Status of Donor-Conceived Children" which states as follows: "**Client will be the legal parent of the child[ren] born to Client** with the use of donated sperm **and will be responsible for their support and custody**. Client may wish to consult legal counsel regarding co-parent rights." (*Id.* at 3) (emphasis added). The parties jointly chose the sperm donor.

In July 2021, both Glover and Junior signed an agreement with RMA advising of the possibility that Glover could undergo multiple IVF cycles and of the company's refund policy. Glover signed the agreement as the "Patient"

and Junior signed as her "Partner." (RMA Care Share Agreement, 7/11/21, at 2).

Glover became pregnant in August 2021, with a due date of May 18, 2022. The couple mutually decided on a name for Child and hired a doula to provide services during the pregnancy. In October 2021, Glover and Junior retained the Jerner Law Group, P.C. as counsel to provide adoption services in anticipation of Junior's adoption of Child. (*See* Engagement Letter, 10/13/21).

On December 5, 2021, the parties contemporaneously executed separate affidavits wherein they acknowledged that Glover is the biological mother of Child. The affidavits essentially mirror one another and Glover's affidavit provides in pertinent part:

* * *

2. **I am married** to Nicole Shawan Junior and **we intend to remain a committed couple**.

3. I am seeking to have **my spouse**, Nicole Shawan Junior **adopt this child** in order to provide this child with the legal stability of two parents.

4. I understand that this means that Nicole Shawan Junior will become a legal parent, with rights equal to my rights as a biological parent.

5. I understand that this means Nicole Shawan Junior will have custody rights and child support obligations to this child [if] we ever separate in the future.

* * *

7. **I understand that an adoption decree is intended to be a permanent court order**, which cannot be changed or undone in the future.

\*     \*     \*

10. I want Nicole Shawan Junior to become a legal parent to this child because I believe it is in the best interests of the child.

(Affidavit of Glover, 12/05/21) (emphasis added). Additionally, both Glover and Junior averred that they "have been advised of [the] right to seek separate legal counsel on the issue of this adoption and I have chosen not to seek outside counsel beyond Jerner Law Group, P.C." (Affidavits of Glover and Junior, at ¶ 8).

**B.**

The couple experienced marital issues and in January 2022, Junior moved from their shared bedroom into their basement. Junior traveled to Portland and advised Glover that she intended to move out of their residence when the lease expired in July 2022. Glover stopped advising Junior of her obstetrics appointments and cancelled all other joint plans concerning the pregnancy, including a baby shower. Glover also informed Junior that she no longer intended to go forward with adoption proceedings.

Glover filed a complaint in divorce on April 18, 2022. Junior filed a petition seeking the pre-birth establishment of parentage, along with an emergency petition to establish the same. After a hearing on May 3, 2022, the trial court entered an order granting Junior's petitions holding that she is the legal parent of Child. The order directed Glover to inform Junior of when

she goes into labor and provided that Junior be allowed access to Child. The trial court ordered Glover to list Junior as Child's second parent on the birth certificate and on the birthing parent's worksheet provided by the state. (**See** Order 5/04/22). The court advised that its order could not be construed as a custody order, and that the parties may file a custody complaint when appropriate.[1] Glover timely appealed and she and the trial court complied with Rule 1925. **See** Pa.R.A.P. 1925(a)-(b).

In its Rule 1925(a) opinion, the trial court held that Junior is the legal parent of Child pursuant to the law of contracts because the parties "formed a binding agreement for Junior, as a non-biologically related intended parent, to assume the status of legal parent to Child through the use of assistive reproductive technology." (Trial Court Opinion, 8/01/22, at 9-10; **see id.** at 7). The court reached this conclusion because the then-married parties, "jointly consulted with and executed contracts with a fertility clinic (RMA), a sperm bank (Fairfax Cryobank) and later a doula in preparation for childbirth . . . [and] both Glover and Junior signed affidavits which memorialized their joint intent to have Junior adopt the Child[.]" (**Id.** at 9). The court also made clear that it based its decision solely on the law of contracts as interpreted by

---

[1] Child was born on May 25, 2022, and Junior initiated custody proceedings shortly thereafter.

established Pennsylvania caselaw and not on any other legal doctrine. (***See id.*** at 13).

## II.

On appeal, Glover contends the trial court erred in determining that Junior is Child's legal parent because it summarily concluded, without factual or legal support, that Junior is Child's legal parent without identifying a supporting contract theory or providing the terms of an enforceable contract that would give legal rights to Junior. (***See*** Glover's Brief, at 24).[2] Glover also maintains that the trial court improperly found waiver of her challenge to its subject matter jurisdiction to rule on Junior's petitions and contends the issue of parentage was not ripe for review. (***See id.*** at 4). Glover argues that absent successfully pursuing parentage through the adoption process, Junior has no legal status regarding Child. (***See id.*** at 21-38).

## A.

Parentage of a child is typically established "through a formal adoption pursuant to the Adoption Act[3], or when two persons contribute sperm and

_____

[2] "In considering this pure question of law, our standard of review is *de novo* and the scope of our review is plenary." ***Ferguson v. McKiernan***, 940 A.2d 1236, 1242 (Pa. 2007) (citation omitted). We are also mindful that in considering the language of a contract, we must construe it only as written and may not modify the plain meaning under the guise of interpretation. ***See Sw. Energy Prod. Co. v. Forest Res.***, ***LLC***, 83 A.3d 177, 187 (Pa. Super. 2013).

[3] 23 Pa.C.S. §§ 2101-2938.

egg, respectively, either through a sexual encounter or clinical setting[.]" *C.G. v. J.H.*, 193 A.3d 891, 803 (Pa. 2018). However, because of the "increased availability of reproductive technologies to assist in the conception and birth of children, the courts are recognizing that arrangements in this latter context may differ and thus should be treated differently than a situation where a child is the result of a sexual encounter." *Id.* Because the willingness of persons to act as reproductive donors and gestational carriers is dependent at least in part on extinguishment of their parental claim to any resulting child and of any obligation to provide the child with financial support, "contracts regarding the parental status of the biological contributors . . . [must be] honored in order to prohibit restricting a person's reproductive options." *Id.* at 903-04 (citation omitted). Moreover, after a child is conceived through the use of a surrogate and an egg donor, both of whom contracted away any parental rights to the child, the non-biologically related intended parent's contract to assume the role of legal parent is enforceable. *See In re Baby S.*, 128 A.3d 296, 298 (Pa. Super. 2015). This issue has been considered in several different contexts.

In *Ferguson*, our Supreme Court considered the enforceability of an oral agreement pertaining to parentage between the two biological parents — the sperm donor and the prospective mother. The parties agreed that the donor would provide sperm for mother's IVF treatment and relinquish any rights arising from his biological paternity of the resultant child(ren). In

exchange, mother agreed not to seek child support from him. *See id.* at 1241. Mother gave birth to twins and the parties acted consistently with their agreement for approximately five years, when mother filed for child support. Our Supreme Court held that the parties' agreement was binding and enforceable against the biological father and that mother was barred from seeking child support. *See id.* at 1248.

In *In re Baby S.*, we considered the establishment of parentage by contract in the context of a surrogacy arrangement. In that case, husband and wife entered into a service agreement for IVF treatment with a company that coordinates with gestational carriers. The agreement identified husband and wife as the "Intended Parents" and they were matched with a gestational carrier. The couple hired counsel to represent them through the surrogacy process and wife made clear that she wanted to be named the mother on the child's birth certificate without having to adopt the child.

Husband and wife also executed an agreement with an anonymous egg donor providing that, "the Intended Mother shall enter her name as the mother and Intended Father shall enter his name as the father **on the birth certificate of any Child born from such Donated Ova** . . . Donor understands that the Intended Parents shall be **conclusively presumed to be the legal parents** of any Child conceived pursuant to this Agreement." *Id.* at 299–300 (record citation omitted) (emphasis added).

The husband and wife additionally entered a contract with a gestational carrier identifying them as the intended parents, obligating them to "accept custody and legal parentage of any Child born pursuant to this Agreement" and averring that the intended mother wished to be the mother of a child who was biologically related to her husband. ***Id.*** at 300. The agreement made plain that the gestational carrier would have no parental rights or obligations with respect to any child conceived pursuant to the contract.

The surrogate became pregnant with an embryo created from father's sperm and the egg donor's egg. Although wife primarily financed the procedure, she refused to sign the necessary documentation to record her name on child's birth certificate because of marital difficulties. While pregnant, the gestational carrier sought a court order declaring husband and wife to be the legal parents of the child. ***See id.*** at 301. When child was born, the gestational carrier was named as the mother and during the ensuing court proceedings, wife argued that the gestational carrier contract and related agreements were unenforceable. The trial court disagreed, and entered an order confirming wife as the legal mother of Child, a non-biological related person. ***See id***. at 298. We affirmed the trial court's order confirming her parentage on appeal.

Finally, in ***C.G.***, our Supreme Court considered the issue of parentage by contract where a former same-sex partner asserted standing to seek custody as the parent of a child conceived through use of a sperm donor during

her long-term non-marital relationship with the biological mother. In holding that she did not, the Court opined that the former partner was not a "parent" because she had no biological connection to the child, had not officially adopted the Child, and had not entered into the type of contract that our Courts have recognized as affording legal parentage through contract. *See id.* at 442-43. The Court denied standing to C.G. despite the fact that she had resided with the biological mother and the child for five years. In doing so, the Court observed that "the case law of this Commonwealth permits assumption or relinquishment of legal parental status, under the **narrow circumstances** of using assistive reproductive technology, **and forming a binding agreement** with respect thereto." *Id.* at 904 (emphasis added).

What those cases teach us is that "there appears to be little doubt that the case law of this Commonwealth permits assumption or relinquishment of legal parental status, under the narrow circumstances of using assistive reproductive technology, and forming a binding agreement with respect thereto." *C.G*. at 904. However, absent an enforceable contract, a same-sex partner does not have custody rights to a child even though she lived with child and former partner for five years. The question in this case then is whether there was an enforceable contract in place that conferred parental rights on Junior. We can find none.

None of documents involved in this case identify Junior as the legal parent to Child. Junior was not a party to the Fairfax Cryobank sperm donation

agreement that referred to Glover as the legal parent. Though both Glover and Junior signed an agreement with RMA regarding IVF, Glover signed the agreement as the "Patient" and Junior signed as her "Partner." It was not an agreement intended to confer any parental rights on Junior, but to explain the procedure and the obligation for payment of fees.

In the affidavits and retainer agreement each signed with the Jerner Law Group, there was no requirement that Junior be listed on Child's birth certificate and no waiver of the adoption process. To the contrary, those affidavits and retainer agreement demonstrate that the parties intended that a formal adoption process was necessary before any legal parentage rights could be conferred on Junior.[4] Because Junior has no legal rights concerning

_____

[4] The dissent posits that this is the perfect opportunity for our Supreme Court to adopt "intent-based parentage" to determine whether the parties had entered into a contract affording legal parentage. Even though it acknowledges that our Supreme Court has not adopted an "intent-based parentage," the dissent apparently adopts that approach by focusing on the purported emotional roles played by the parties during their relationship, as represented by Junior, rather than on the meaning of the words contained in the documents to see if there was an agreement regarding parentage. Although they could have easily chosen to include in the affidavits or other document a requirement that Junior be listed on Child's birth certificate without the need for an adoption process (as Mother and Father did in **In re Baby S.**), the parties contemplated that conferring legal parentage to Junior would be through adoption only.

Child in the absence of adoption as contemplated by the parties, we reverse the order of the trial court in its entirety.[5]

    Order reversed. Jurisdiction relinquished.

    Judge King joins the memorandum.

    Judge Bowes files a dissenting memorandum.

---

[5] Based on our disposition, we need not reach Glover's remaining two claims pertaining to subject matter jurisdiction and ripeness. We briefly note with regard to jurisdiction, our agreement with the trial court that given the unique circumstances of Child's conception and birth, coupled with the significance of the issue of parentage to all involved, the trial court acted within the broad scope of its authority pursuant to the Divorce Code to rule on Junior's petition to protect her potential interests. **See** 23 Pa.C.S. § 3104(a)(5) (providing trial court in divorce action with broad jurisdiction to rule on "any other matters pertaining to the marriage and divorce . . . and which fairly and expeditiously may be determined and disposed of in such action."); **see also** 23 Pa.C.S. § 3323(f) (catch-all provision granting trial court in matrimonial cases full equity and jurisdiction to issue orders necessary to protect interests of parties).

We also agree with the trial court that the issue of parentage was ripe for review just three weeks prior to Child's birth, and that this Court in **In re Baby S.**, recognized a pre-birth cause of action in contract law. (**See** Trial Ct. Op., at 11-12); **see also Del Ciotto v. Pennsylvania Hosp. of the Univ. of Penn Health Sys.**, 177 A.3d 335, 358 (Pa. Super. 2017) (explaining that the ripeness doctrine is premised on policy that courts should avoid premature adjudication of issues so as not to not give answers to academic questions, render advisory opinions or make decisions based on assertions as to hypothetical events).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>2/24/2023</u>