**[J-50-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| CHANEL GLOVER, | : | No. 9 EAP 2024 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court entered on |
| | : | December 11, 2023, at No. 1369 |
| v. | : | EDA 2022, affirming the Order of the |
| | : | Court of Common Pleas of |
| | : | Philadelphia County, Domestic |
| NICOLE JUNIOR, | : | Relations Division, entered on May |
| | : | 4, 2022, at No. D22048480. |
| Appellee | : | |
| | : | ARGUED: September 11, 2024 |

**OPINION**

**JUSTICE DOUGHERTY**                    **DECIDED: March 20, 2025**

## I.    Introduction

Our law in this Commonwealth presently recognizes four pathways to establish legal parentage: biology, adoption, equity (*i.e.*, parentage by a marital presumption or estoppel), and contract where a child is born using Assistive Reproductive Technology (ART). As we explain below, none of these existing paths applies to the facts of this case, which involves a married same-sex couple who conceived a child using a sperm donor and ART but did not enter into a contract and separated before the child was born. We believe the time has come for our law to embrace a fifth pathway to parentage to account for the situation at hand. We thus adopt the doctrine of intent-based parentage into our common law and affirm the Superior Court *en banc* to the extent it found parentage was established under that theory.

## II. Background

Chanel Glover and Nicole Junior met in 2019, and they got married in California in January 2021. The couple discussed starting a family using ART, even before marriage. The month they got married, they reached out to a fertility clinic, RMA South California (RMA), to learn about their options. The parties attended a consultation about different ART options and later underwent blood testing. They eventually decided to pursue conception using *in vitro* fertilization (IVF).

On February 3, 2021, the couple entered into a contract with Fairfax Cryobank for donated sperm. The contract listed Glover as the "Intended Parent[]" and Junior as the "Co-Intended Parent[]." Fairfax Cryobank Contract at 1. The contract had a signature line for the "Intended Parent" but not the "Co-Intended Parent," and only Glover signed the document. *See id.* at 5.[1] Thereafter, the couple jointly selected a sperm donor. Junior testified the couple chose the specific sperm donor because he shared resemblances with Junior, who would not be biologically related to the Child, and the couple believed the similarities to be "kismet." *See* N.T. 5/3/2022, at 25-26 (explaining like Junior, the donor had dark skin, almond-shaped eyes, a wide smile, high cheekbones, was a Sagittarius, traced his ancestry to Benin, and had an appreciation for the arts).

Subsequently, the couple decided to move to Pennsylvania to be closer to family, and in April 2021, they moved to Philadelphia. There, they continued to work with RMA at its Philadelphia-area location. On July 11, 2021, both parties entered into an IVF contract with RMA, the "CareShare Agreement," wherein Glover signed as "Patient" and Junior signed as "Partner." RMA CareShare Agreement at 9. That contract explained RMA's CareShare program operates differently than a traditional IVF program, as it

---

[1] Junior was further identified as a "Designated Individual" who was given access to Glover's client account information and the ability to authorize shipment of Glover's vials to the identified physician. Fairfax Cryobank Contract at 7.

"allows for the possibility of multiple IVF cycles for a single fee and, under certain circumstances, provides a refund[,]" rather than requiring patients to pay for individual IVF treatment cycles. *Id.* at 1. Within the contract, Glover and Junior agreed to (among other things) payment of RMA's fees and waiver of related health insurance claims. *See id.* at 3.[2] In August of 2021, Child was conceived *via* IVF using Glover's egg and the sperm from Fairfax Cryobank. As part of that process, Junior accompanied Glover to King of Prussia for the medical procedure to retrieve her eggs and waited in the parking garage with Glover's mother. Junior also administered to Glover various hormone injections into her abdomen and buttocks over a period of three months before and after conception. After Glover became pregnant, she and Junior jointly attended obstetrics appointments.

In November 2021, both Glover and Junior signed a Representation Agreement with Jerner Law Group, P.C., in anticipation of Junior's "Confirmatory Step-Parent Adoption" of Child. *See* Jerner Representation Agreement (Oct. 13, 2021 email from Rebecca L. Nayak to Glover and Junior); Confirmation of Representation Agreement (signed by Junior and Glover 11/1/2021 and 11/2/2021, respectively). In the contract with Jerner, the parties agreed to joint representation and terms of payment. On December 5, 2021, both parties signed affidavits expressing their intent for Junior to adopt Child. In Glover's affidavit, she attested, *inter alia*: "I am married to [Junior] and we intend to remain a committed couple"; "I am seeking to have my spouse, [Junior,] adopt this child in order to provide this child with the legal stability of two parents"; "I understand that this means

---

[2] The CareShare contract further provided:

> You and your partner, if applicable, must jointly sign this Agreement. If during the term of this Agreement there occurs a change in legal or other status (i.e. divorce, legal separation or annulment), you are required to immediately notify RMAPHL and you will be deemed to have self-withdrawn from the Program, and you will not be entitled to a refund.

RMA CareShare Agreement at 6.

[Junior] will become a legal parent, with rights **equal** to my rights as a biological parent"; "I understand that this means [Junior] will have custody rights and child support obligations to this child if we ever separate in the future"; "I understand that an adoption decree is intended to be a permanent court order, which cannot be changed or undone in the future"; "I understand that, because I have chosen not to seek outside counsel, I am waiving my right to confidentiality with respect to [Junior]. . . . In the event of future litigation between me and [Junior], I consent to the release of this Affidavit to [Junior]"; and "I want [Junior] to become a legal parent to this child because I believe it is in the best interests of the child." Glover Aff., 12/5/2021 (emphasis in original). Junior attested to the same. *See* Junior Aff., 12/5/2021. Additionally, the parties jointly entered into a contract with a doula in January 2022. In the doula contract, the parties agreed to the doula's terms of service, fees, and payments. Both Glover and Junior were listed as "Client[s]," and they both signed the contract. Doula Contract at 4 (unpaginated). Together, the parties also picked out a name for the child, which included a hyphenated last name combining "Glover" and "Junior."[3]

Over the next few months, the parties' relationship deteriorated. In early January of 2022, Junior moved out of the couple's shared bedroom into the basement of their residence. On March 17, 2022, Glover learned Junior (who was in Washington state attending multiple writers' residencies) would be returning to Philadelphia two days later and intended to move out of the shared residence when the lease expired on July 31, 2022. At some point, Glover stopped sharing her Google calendar with Junior (which included obstetrics appointments), ended joint appointments with the doula, and cancelled the baby shower that the parties planned together. In March of 2022, Glover

---

[3] The trial court found that "[e]ven after separation, Glover advised Junior that she intended to use the agreed upon name for the expected child." Trial Court Op. at 3.

informed Junior that she no longer intended to proceed with Junior's second-parent adoption. On April 18, 2022, Glover filed the underlying complaint in divorce.

Then, on April 27, 2022, Junior filed a petition for special relief for pre-birth establishment of parentage and an emergency petition for the same. In the petitions (which were the impetus for the present appeal), Junior sought an order (1) confirming Junior as a legal parent to the child, (2) requiring that Junior be informed as soon as Glover went into labor and that Junior be given access to the hospital and the child after birth, and (3) ordering that Junior's name appear as the second parent on the child's birth certificate. Glover filed an answer challenging the petition, and the family court held an evidentiary hearing on May 3, 2022.

The next day, the family court entered an order in Junior's favor:

It is hereby ordered and decreed that: (1) [Junior] is confirmed as the legal parent of the child conceived during [Junior's] marriage to [Glover] via [IVF] and due to be born in May of 2022; (2) [Glover] shall advise Junior when she goes into labor; (3) Both [Glover] and Junior shall have access to the child after birth consistent with [Glover's] medical privacy rights and the hospital's policies regarding newborn children. However, this paragraph shall not in any way be construed as a custody order; ([4]) [Glover] shall execute the Commonwealth of Pennsylvania's Birthing Parent's worksheet indicating that [Junior] is the child's other parent; and ([5]) the name of Nicole S. Junior shall appear on the child's birth certificate as a second parent.

When appropriate, a custody complaint may be filed under a custody case number.

Trial Court Order, 5/4/2022 at 1. Glover timely appealed, questioning, *inter alia*,[4] "[d]id the trial court act within its discretion and err as a matter of law when it confirmed pre-birth legal parentage of [Junior?]" Glover's Superior Court Brief at 5.[5]

The trial court issued a Rule 1925(a) opinion in support of its order. Primarily, the court held "Junior is the legal parent of the child pursuant to the law of contracts." Trial Court Op. at 7 (capitalization omitted). The trial court explained "Pennsylvania courts have recognized the validity and enforceability of contracts involving [ART]." *Id.* at 8, *citing C.G. v. J.H.*, 193 A.3d 891, 904 (Pa. 2018) ("there appears to be little doubt that the case law of this Commonwealth permits assumption or relinquishment of legal parental status, under the narrow circumstances of using [ART], and forming a binding agreement with respect thereto"); *Ferguson v. McKiernan*, 940 A.2d 1236 (Pa. 2007) (enforcing oral contract between biological birth mother and sperm donor for release of donor's parental

---

[4] Glover also raised the following questions:

> 1. Did the trial court err as a matter of law when it found that [Glover] waived any challenges to the [c]ourt's exercise of its jurisdiction and to its being a proper forum for a decision regarding [Junior's] rights as a legal parent[?]

> 2. Did the trial court err when it found that the issue of parentage was ripe for determination[?]

Glover's Superior Court Brief at 5. The Superior Court disposed of these issues in Junior's favor, Glover does not challenge those holdings on appeal to this Court, and we do not discuss them further.

[5] Glover also filed an application for emergency relief requesting a stay of the court's May 4, 2022 order. Initially, the Superior Court temporarily stayed the trial court's order pending the filing of related pleadings, and then issued a *per curiam* order granting in part and denying in part the emergency petition for a stay. Specifically, the Superior Court stayed the May 4, 2022 order only insofar as it directed that Junior's name appear on the birth certificate. Additionally, after Child's birth on May 25, 2022, Junior filed a Complaint for Shared Physical Custody. The parties have not elaborated on the status of the custody litigation, but during oral argument before this Court, counsel mentioned that Junior has not had contact with the Child. *See also Glover v. Junior*, 306 A.3d 899, 905 n.3 (Pa. Super. 2023) (*en banc*).

rights/obligations); *In re Baby S.*, 128 A.3d 296 (Pa. Super. 2015) (enforcing written contract eliminating parental rights of gestational carrier and imposing parental rights/obligations on intended non-biological mother).[6]

Considering that precedent, the trial court found a contract existed under the facts of this case. It looked at the evidence showing Glover and Junior, as a married couple, mutually agreed to conceive a child using ART, including the various written agreements and the parties' affidavits. The court then determined "the undisputed evidence . . . conclusively established that the parties, a married couple, formed a binding agreement for Junior, as a non-biologically related intended parent, to assume the status of legal parent to the Child [conceived] through the use of [ART]." *Id.* at 9-10.[7]

On appeal, a three-judge panel of the Superior Court initially reversed the trial court's decision, holding Junior's parentage was not established by contract. Although the majority recognized parentage contracts in the ART context are enforceable, it held no contract existed in this case to confer parental rights on Junior. Looking at the written contracts, it determined none of the documents identify Junior as the legal parent to Child. Judge Bowes dissented, reasoning that beyond the terms of the written contracts discussed by the panel majority, an oral contract existed between Junior and Glover, or alternatively, that parentage could be established using estoppel principles. Finally,

---

[6] The trial court further recognized that in *C.G.*, three Justices (including this author) expressed their belief in two concurring opinions that the *C.G.* majority's conception of parentage was too narrow, and that parentage may be determined by the intent of parties who conceive a child together using ART. *See* Trial Court Op. at 9. The trial court agreed and "urge[d] the appellate courts, when presented with a factually appropriate scenario, [to] adopt an intent-based analysis for persons pursuing parentage through [ART]." *Id.*

[7] The trial court also specifically stated it did not apply the doctrines of paternity by estoppel or presumption of paternity when considering Junior's legal parentage. *See* Trial Court Op. at 12-13.

Judge Bowes noted this case presents a perfect opportunity for this Court to delineate the proper application of intent-based parentage as discussed in *C.G.*

Junior filed an application for re-argument *en banc*, which the Superior Court granted. The *en banc* panel affirmed the trial court, with Judge Bowes now writing for the majority. *See Glover v. Junior*, 306 A.3d 899 (Pa. Super. 2023) (*en banc*). As an initial matter, the court held the marital presumption of parentage did not apply. It explained the marital presumption doctrine provides that "generally, a child conceived or born during the marriage is presumed to be the child of the marriage; this presumption is one of the strongest presumptions of the law of Pennsylvania[.]" *Id.* at 908, *quoting Brinkley v. King*, 701 A.2d 176, 179 (Pa. 1997) (plurality). The Superior Court elaborated that while the presumption is equally applicable to same-sex and opposite-sex spouses, *see Int. of A.M.*, 223 A.3d 691, 695 (Pa. Super. 2019), its purpose is "to preserve the inviolability of the intact marriage," and thus it is inapplicable if there is no intact family or marriage to preserve. *Glover*, 306 A.3d at 908. The court recognized "the onset of the divorce proceedings is not determinative" of whether the doctrine's purpose can be served, but it looked to the trial court's factual findings and held "the certified record demonstrates that the marriage was over at the time parentage was placed at issue." *Id.* at 910.

The *en banc* majority next turned to the crux of the trial court's holding — whether a contract existed. Addressing the standard of review, the court stated, "[w]hether individuals can enter into an enforceable agreement to determine parentage and parental rights involves a legal question that we review *de novo*." *Id.*, *citing Ferguson*, 940 A.2d at 1242. It further determined its "scope of review is plenary." *Id.*[8] The court then

---

[8] We note the Superior Court earlier stated it "review[s] orders relating to parentage for an abuse of discretion or an error of law." *Glover*, 306 A.3d at 908. But it appears to have applied the broader *de novo* standard of review and plenary scope of review to the contract analysis.

provided foundational principles underlying contract law.  It explained the "policy behind contract law is to protect the parties' expectation interests by putting the aggrieved party in as good a position as he would have been had the contract been performed."  *Id.* (citation omitted).  The court explained that regardless of whether a contract is oral or written, it must have three elements: (1) mutual assent; (2) consideration; and (3) sufficiently definite terms.  *Id.* at 911.  It further observed:

> [N]ot every term of a contract must always be stated in complete detail.  If the parties have agreed on the essential terms, the contract is enforceable even though recorded only in an informal memorandum that requires future approval or negotiation of incidental terms.  In the event that an essential term is not clearly expressed in their writing but the parties' intent concerning that term is otherwise apparent, the court may infer the parties' intent from other evidence and impose a term consistent with it.

*Id.*, *quoting Helpin v. Trustees of Univ. of Pa.*, 969 A.2d 601, 610-11 (Pa. Super. 2009).  The Superior Court then undertook a thorough review of the preeminent cases in this area — *Ferguson*, *Baby S.*, and *C.G.*

In *Ferguson*, we held an oral contract for sperm donation was enforceable in Pennsylvania.  There, the mother and her former paramour (sperm donor) orally agreed he would furnish sperm in a manner akin to anonymous sperm donation: "it would be carried out in a clinical setting; [s]perm [d]onor's role in the conception would remain confidential; and neither would [s]perm [d]onor seek visitation nor would [m]other demand from him any support, financial or otherwise."  *Ferguson*, 940 A.2d at 1238.  Mother became pregnant with twins, and both parties abided by the agreement until the twins were about five years old.  At that point, mother filed a lawsuit against sperm donor seeking child support.  The lower courts held the parties' oral contract was unenforceable pursuant to public policy.  On appeal, we reversed.

Despite recognizing the Commonwealth's general policy that parents cannot bargain away their children's right to support, we held the oral ART contract did not violate

public policy considering "the evolving role played by [ART] in contemporary American society." *Id.* at 1245. "[T]he inescapable reality[,]" we observed, "is that all manner of arrangements involving the donation of sperm or eggs abound in contemporary society, many of them couched in contracts or agreements of varying degrees of formality." *Id.* (recognizing an "increasing number of would-be mothers" are using ART, and neither the public nor the General Assembly had chosen to proscribe these arrangements). We further reasoned that holding otherwise would limit a would-be mother to using only anonymous sperm donation to ensure legal protections, even if she had a preference for using the sperm of someone she knows. Moreover, we posited that holding such contracts unenforceable would discourage would-be donors from providing sperm because they would be at risk of future support liability and would "significantly limit[] a would-be mother's reproductive prerogatives." *Id.* at 1247. We recognized our holding denied the twins a second source of support, but we noted that, in the absence of the parties' agreement, "the twins would not have been born at all, or would have been born to a different and anonymous sperm donor, who neither party disputes would be safe from a support order." *Id.*

Nearly a decade later, the Superior Court similarly upheld multiple ART contracts in *Baby S.,* but there, the contracts **imposed** parental obligations on a non-biological, non-gestational mother. In that case, a wife and her husband decided to use an egg donor and a gestational carrier to conceive a child. They entered into various written contracts identifying them as "Intended Parents." *See Baby S.*, 128 A.3d at 298-300. Most relevantly, wife and husband entered into a contract with the gestational carrier, which provided "[t]he Gestational Carrier shall have no parental or custodial rights or obligations of any Child conceived pursuant to the terms of this Agreement" and that "the Intended Parents agree to assume legal responsibility for any Child born pursuant to this

Agreement[.]" *Id.* at 300.  The parties went through with the embryo transfer, and the gestational carrier became pregnant.  Before the baby was born, husband and wife started having marital difficulties, and wife refused to do the necessary paperwork to be listed on the child's birth certificate.  The gestational carrier filed a petition seeking a court order declaring wife and husband the legal parents and directing that they be named as parents on the birth certificate.  Wife attempted to avoid parentage, arguing the gestational carrier contract was unenforceable.

Relying on *Ferguson*, the Superior Court held the contract was enforceable.  The court rejected wife's arguments that *Ferguson* did not address whether parentage can be established *via* contract and that it can be established biologically or by adoption only.  It emphasized that wife's actions before and during the pregnancy "were consistent with her declared intention to be Baby S.'s mother," and highlighted that as in *Ferguson*, "Baby S. would not have been born but for [wife's] actions and express agreement to be the child's legal mother." *Id.* at 306.  The Superior Court then reasoned *Ferguson* "expressly recognized the enforceability of a contract that addressed parental rights and obligations in the context of [ART]," and "the evolving role played by [ART] in contemporary American society." *Id.*  The Superior Court explained our "language and focus [in *Ferguson*] on the parties' intent" was "at odds" with wife's contention that gestational carrier contracts violated dominant public policy. *Id.*  It added that "the Adoption Act is not the exclusive means by which an individual with no genetic connection to a child can become the child's legal parent" and the Act did not evince a public policy against the enforcement of gestational carrier contracts. *Id.*  Thus, the court held the contract was binding and enforceable against wife to establish her legal parentage.

Then, in *C.G.*, this Court reaffirmed that parentage can be established by contract, but we did not go so far as to adopt an intent-based parentage doctrine.  In that case,

C.G. and J.H. were a same-sex couple who never married.[9]  During their relationship, J.H. got pregnant by intrauterine insemination using an anonymous sperm donor and her own ovum.  C.G. shared no genetic relationship with the resulting child and never adopted him, but C.G. lived with J.H. and the child for about five years before the couple separated, at which point J.H. and the child relocated to Pennsylvania.  A few years later, C.G. filed a custody complaint seeking shared legal and partial physical custody, arguing she had standing as a "parent" under 23 Pa.C.S. §5324 (or alternatively stood *in loco parentis* under that provision), and claiming the child was conceived with the mutual intent of both parties.  J.H. refuted that claim.  After considering the parties' conflicting testimony and evidence about C.G.'s role in the child's conception, birth, and upbringing, the trial court found as fact that the parties did not share an intent to conceive and raise the child together, but that C.G. merely acquiesced to J.H. having the child.  The trial court held C.G. did not have standing (as a "parent" or otherwise), and the Superior Court affirmed.

On appeal, we affirmed that C.G. lacked standing.  We first recognized Section 5324 does not provide a definition of "parent," but it plainly encompasses biological mothers and fathers as well as adoptive parents.  *See C.G.*, 193 A.3d at 900.  We acknowledged, however, "the reality of the evolving concept of what comprises a family cannot be overlooked."  *Id.*  In that regard, we explained our courts had recognized parentage could also be established (or relinquished) by contract in the ART context.  *See id.* at 901-04, *citing Ferguson* and *Baby S.  See also id.* at 904 ("there appears to be little doubt that the case law of this Commonwealth permits assumption or relinquishment of legal parental status, under the narrow circumstances of using [ART], and forming a binding agreement with respect thereto").  We held "this narrow judicial recognition of

---

[9] When the child was born, the couple resided in Florida, where same-sex marriage and second-parent adoptions were not recognized.  They did not seek a second-parent adoption once it was legalized in that state a few years later.

legal parentage by contract" did not afford C.G. relief, as there was no dispute that C.G. was "not party to a contract or identified as an intended-parent when J.H. undertook to become pregnant[.]" *Id.* We likewise rejected C.G.'s argument our case law stood "for the broad proposition that parentage can be established by intent in situations where a child is born with the aid of [ART]." *Id.* at 905. We determined C.G. did not fit within the existing "framework for establishing parentage in the absence of adoption, biology, or a presumption attendant to marriage." *Id.* at 906.

The *C.G.* majority opinion spoke to the status of our case law at that time and in the context of the specific facts of that case, but it also acknowledged the concurring opinions (by this author and Justice Wecht) advocated for a more flexible definition of parentage focused on the intent of the parties. The majority clarified "nothing in [its] decision is intended to absolutely foreclose the possibility of attaining recognition as a legal parent through other means." *Id.* at 904 n.11. It held, however, "under the facts before this Court, this case does not present an opportunity for such recognition, as the trial court found as fact that the parties did not mutually intend to conceive and raise a child, and the parties did not jointly participate in the process." *Id.* Rather, it determined "we must await another case with different facts before we may properly consider the invitation to expand the definition of 'parent.'" *Id.*, *quoting id.* at 913 (Dougherty, J., concurring).

As noted, this author concurred in the result, agreeing with the majority that the issue was not then properly before us. *See id.* at 913 (Dougherty, J., concurring) (it is "unnecessary at this juncture to endorse any particular new test for establishing standing as a parent" as the facts "preclude a holding that C.G. has standing as a parent under any of the proffered definitions of intent-based parentage"). But this author argued the *C.G.* majority offered a "cramped interpretation of 'parent'" in light of "the diverse range

of parental configurations that now exist," and thus presented "a very real and grave risk" of inflicting disproportionate hardship on nontraditional families, namely those of same-sex couples. *Id.* at 911-12 (Dougherty, J., concurring). *See also id.* at 912 ("Instead, I believe there is room in our precedent — particularly in the absence of any guidance from the legislature — to conclude an individual who lacks biological, adoptive, or marital ties may nevertheless establish standing as a parent to seek custody under 23 Pa.C.S. §5324(1).").

In his concurring opinion, Justice Wecht (joined by Justice Donohue) expressed his view that the Court should "imagine and embrace the intent-based paradigm that ART-related child custody disputes require." *Id.* at 914 (Wecht, J., concurring). Justice Wecht explained that *Ferguson* and *Baby S.* would have resulted in the same holding if an intent-based principle applied rather than a contract theory. *See id.* at 915 ("This is unsurprising, inasmuch as the contract evidences the intent."). But he also predicted a contract theory would not be helpful in all circumstances:

> [S]uppose that the members of a same-sex couple decide that one partner will become pregnant via ART and sperm donation; it is entirely foreseeable that only the partner being impregnated would contract with the ART facility. The second partner, who would have no biological connection to the child, would have no contract establishing a claim to parentage. Suppose further that no adoption is formalized, and that the couple separates after years in which both parties diligently raise and lovingly support the resulting child. Under the Majority's approach, the second partner has no claim to parent status and no standing to pursue any custody rights. Such a result is by no means dictated by the terms or spirit of our custody standing statute, which speaks in this regard only of "[a] parent of the child", thus begging the question now at hand. *See* 23 Pa.C.S. §5324(1). As well, such a result supplants the best interests analysis, eliminates the focus on the child's needs, and fails entirely to comport with contemporary family realities and especially the circumstances of Pennsylvanians who are parenting in same-sex relationships.
>
> But, wait, you say. The second partner in the scenario imagined above almost certainly would enjoy standing in custody under an *in loco parentis* theory. . . . The problem is not so simple. First, if the couple separates shortly after (or before) the child's birth, the second partner — who fully

intended to be a parent (and this with the first partner's knowledge and consent) — will have no claim to *in loco parentis* standing, there having been insufficient time for assumption of parental status and discharge of parental duties. . . . Second, and more significantly, resort to an *in loco parentis* approach concedes the parentage claim, which is the very issue that is at bar here. The point is that the second partner in these scenarios should be considered a parent for purposes of standing in custody. *In loco parentis* generally is considered a species of standing sought by third parties.

*Id.* at 915-16. According to Justice Wecht, "[a]s a matter of law, a same-sex partner who participated in the decision to bring a child into the world, to raise, to educate, to support and to nurture that child, is no longer a third party. He or she is a parent." *Id.* at 916. Bound by the trial court's fact-finding, however, he concurred C.G. was not a parent.

After explaining the stage set by *Ferguson*, *Baby S.*, and *C.G.*, the *en banc* Superior Court majority in the present case held Junior established parentage by three alternative means: (1) a contract-based right; (2) equitable estoppel; and (3) intent-based parentage. Starting with the contract-based right, the Superior Court determined the record revealed "a sufficient basis, as evidenced by the agreements and the conduct of the parties, to confer parentage on Junior." *Glover*, 306 A.3d at 913. It observed Junior was either referenced as a party or beneficiary in the RMA CareShare Agreement, the Fairfax Cryobank Contract, the Doula Contract, and the Jerner Representation Agreement. *See id.* at 913-14. According to the Superior Court, these contracts "served as evidence that Junior and Glover intended to collectively assume legal parentage of the child born via [ART]." *Id.* at 914.

In addition to this proven "mutual intent," the *en banc* panel reasoned, the parties' conduct established the existence of an oral contract between them. *Id.* It explained "there are three elements of a contract: (1) mutual assent; (2) consideration; and (3) sufficiently definite terms." *Id.* Since the panel determined "the certified record is replete with evidence of the parties' mutual assent to conceive a child of their marriage using

ART, bestow upon Junior legal parent status, and raise the child together as co-parents[,]" it turned to whether the contract was supported by consideration. *Id.* at 914-15. It explained "[c]onsideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Id.* at 915, *quoting Pa. Envtl. Def. Found. v. Commonwealth*, 255 A.3d 289, 305 (Pa. 2021). Ultimately, the court below held the oral contract was supported by consideration because Junior paid for half of all the expenses and shared in the emotional burdens by administering fertility injections into Glover's abdomen and attending medical appointments.

The *en banc* panel further highlighted that "Glover not only agreed to the shared financial and emotional burdens, she continued to assent to the arrangement even after doubting whether she was still committed to co-parenting with Junior." *Id.* It explained:

> [Glover] offered the following explanation for why, despite her apprehensions about continuing her romantic relationship with Junior, she nevertheless executed the fertility contracts identifying Junior as a co-parent rather than proceeding alone or forgoing the IVF program entirely: "I could've moved forward without having to do the [IVF] program. . . . Financially—it was the best decision." [N.T., 5/3/22] at 65.

*Id.* at 915-16 (alterations to quotation supplied by Superior Court). Thus, the Superior Court reasoned, "the certified record bears out that, **in exchange for** the consideration of the shared emotional burden and equally-divided financial cost of the [ART] procedure and birth, Glover agreed that her spouse, Junior, would possess parental rights to the child conceived through their combined efforts." *Id.* at 916 (emphasis added). The court rejected Glover's claims she did not knowingly and intentionally bestow legal rights upon Junior by taking these actions, citing her Affidavit statement she wanted Junior to "become a legal parent, with rights **equal** to [Glover's] rights as a biological parent." Glover Aff., 12/5/2021 at ¶4 (emphasis in original). The Superior Court therefore recognized an enforceable oral contract between Junior and Glover concerning Junior's parentage.

In a footnote, the court also held that even "assuming *arguendo*" Junior did not have a contract-based right to parentage, Glover was barred by the doctrine of equitable estoppel from challenging Junior's parentage. *Glover*, 306 A.3d at 916 n.10. It explained equitable estoppel is a "doctrine of fundamental fairness" which "applies to prevent a party from assuming a position or asserting a right to another's disadvantage inconsistent with a position previously taken[,]" and upon which the other party detrimentally relied. *Id.* The Superior Court reasoned Glover repeatedly demonstrated her assent to Junior's parentage, and held "[t]he record bears out Junior's detrimental reliance and endurance of severe prejudice if Glover were permitted to deny parentage at this juncture." *Id.*

Lastly, the *en banc* panel held in the alternative it would affirm based on principles of intent-based parentage, even if the record did not establish the three elements of a contract. It opined this Court was unable to adopt the doctrine under the facts in *C.G.* but emphasized the rationales of the concurring opinions. It further reasoned the facts of the present case provide another opportunity to address intent-based parentage; it specifically noted "the certified record in this appeal easily supports a finding of parentage by intent." *Id.* at 918 (reiterating the extensive facts described above that Glover and Junior intended to conceive and raise Child together). "Stated plainly," the Superior Court explained, "this appeal is the paradigm of intent-based parentage in cases involving ART, where the couple not only evidenced their mutual intent to conceive and raise the child, but they also participated jointly in the process of creating a new life." *Id.* at 919. "Thus, in addition to affirming the trial court order establishing Junior's parentage based on contract principles," the *en banc* panel "affirm[ed] it upon . . . application of the principles of intent-based parentage that the concurring justices highlighted in *C.G.*" *Id.*[10]

---

[10] Judge King authored a concurring opinion (joined by President Judge Panella and Judge Murray), wherein she agreed Junior had a contract-based right to parentage and that the facts of this case would "fit squarely within an 'intent-based' parentage approach," (continued…)

Glover filed a petition for allowance of appeal, and we granted review on the following issues:

> (1) Did the Superior Court's *en banc* decision conflict with the holding of the Supreme Court of Pennsylvania in *C.G. v. J.H.*, 193 A.3d 891 (2018), by concluding the spouse of the biological mother of a child conceived through Assistive Reproductive Technology, who bore no biological relationship to the child, had a right to parentage of the child, where no contract term establishing the spouse as a legal parent existed and the Superior Court applied "intent-based" parentage, to reach its conclusion that an oral contract established the spouse as a legal parent?

> (2) Should the doctrine of "intent-based" parentage be adopted in Pennsylvania in the context of a child conceived through Assistive Reproductive Technology?

> (3) Did the Superior Court err in holding the spouse of the biological parent of a child conceived through Assistive Reproductive Technology, who bore no biological relationship to the child, had a right to legal parentage of the child as a matter of equity under the circumstances of this case?

*Glover v. Junior*, 314 A.3d 815, 815-16 (Pa. 2024) (*per curiam*).

### III.     Parties' Arguments and Discussion

We take the above issues out of order, first reviewing the contract issue, second the equitable estoppel issue, and finally the intent-based parentage doctrine. We review questions of law *de novo* and apply a plenary scope of review. *See, e.g.*, *C.G.*, 193 A.3d at 898. To the extent we must consider the facts of this case, we will not disturb the trial court's fact findings so long as they are supported by competent evidence of record. *See In re Doe*, 33 A.3d 615, 624 (Pa. 2011).

### A.     Oral Contract

#### 1.     Parties' Arguments

Glover argues the lower courts erred in finding an enforceable oral contract, stressing Junior had not signed a contract clearly assuming the rights and responsibilities

---

but asserted "adoption of an intent-based approach is a task better left for our legislature or Supreme Court[.]" *Glover*, 306 A.3d at 919 (King, J., concurring).

of a parent. She acknowledges under Pennsylvania case law, ART contracts regarding parental status are honored "to prohibit restricting a person's reproductive options." Glover's Brief at 18, *quoting C.G.*, 193 A.3d at 903-04. But, Glover asserts, those contracts are strictly construed, and their purpose is to protect gestational carriers and donors from being legally obligated to the child born using ART. She posits the courts enforce those contracts to promote the willingness of gestational carriers and donors to provide those services. According to Glover, this promotes the institutions of marriage and family, eliminates uncertainty, and reduces the likelihood of unwilling parents for children born by ART.

Glover argues the Superior Court erred when it found a contract existed that conferred parental rights on Junior, and that the court's analysis improperly centered on the parties' intent, which it then inserted into the existing agreements. She claims the Superior Court ignored the plain meaning of the actual, written contracts with Fairfax, RMA, and Jerner Law — none of which included terms granting Junior parentage — and improperly found consideration for a contract between Glover and Junior. Glover argues the written contracts here were not vague: they established Glover as the sole legal parent, and under the Jerner contract, Junior would later become a legal parent only "when and if an adoption occurred and the parties were in an intact family." *Id.* at 27. Thus, she insists *Ferguson* and *Baby S.* are inapposite, and the Superior Court was not free to read additional terms into these unambiguous contracts based on its assumed intent of the parties.

In response, Junior argues the Superior Court's holding an oral contract existed accorded with settled precedent, including *C.G.* Junior stresses Pennsylvania courts have enforced different kinds of ART contracts, including oral contracts. *See* Junior's Brief at 11-12, *citing Ferguson*, 940 A.2d at 1241, 1245 ("The inescapable reality is that

all manner of arrangements involving the donation of sperm or eggs abound in contemporary society, many of them couched in contracts."). In these contract cases, Junior explains, courts routinely consider evidence of the parties' intent. Junior claims the purpose of applying contract principles in ART cases is not just to relieve gestational carriers and donors of unwanted parental responsibilities, but to give effect to the parties' intent. *See id.* at 13-14, *citing J.F. v. D.B.*, 897 A.2d 1261 (Pa. Super. 2006) (holding gestational carrier who did not originally intend to be a parent did not have standing to bring a custody action); *Baby S.*, 128 A.3d at 306 (parentage imposed upon mother seeking to escape its obligations where she entered into surrogacy contract). Even in *C.G.*, Junior notes, the courts considered the parties' intent when determining whether a contract existed; the Court deferred to the trial court's findings that the parties did not mutually intend to conceive and raise the child together, and thus, we held the parties did not enter into a contract. Junior avers the difference in the outcomes between this case and *C.G.* lies in the factual distinctions — here, like in *Ferguson*, the parties formed a legal agreement to raise Child as co-parents.

Junior argues the Superior Court properly held all three elements of a contract were satisfied and that Glover focuses incorrectly on the terms of the written contracts with third parties, which for purposes of this case, serve as evidence of the more important **oral** contract between the **parties**. Junior reiterates the Superior Court's reasoning that the record amply supplies evidence of an oral contract, and rebuts Glover's argument the lower courts' analyses of the parties' intent improperly incorporated intent-based parentage principles into the contract analysis. According to Junior, an analysis of the

parties' intent is independently relevant to determining the existence of a contract, *i.e.*, to establish the parties' mutual assent.[11]

### 2.    Analysis

To address whether the lower courts correctly determined an oral contract established Junior's parentage and parental rights, we must first consider the proper standard of review.  Certainly, "the **interpretation** of a contract is a question of law" subject to a *de novo* standard of review and plenary scope of review.  *Vinculum, Inc. v. Goli Technologies, LLC*, 310 A.3d 231, 242 (Pa. 2024) (emphasis added).  And, as the Superior Court recognized, we established in *Ferguson* that "[w]hether individuals can enter into an enforceable agreement to determine parentage and parental rights involves a legal question that we review *de novo*."  *Glover*, 306 A.3d at 910, *citing Ferguson*, 940 A.2d at 1242.  Here, however, the question is not whether Glover and Junior **could have** entered into a contract — it is whether they did, in fact, enter into a contract.

Accordingly, before we can review the courts' interpretation of the supposed oral contract, we must determine whether one even existed.  Such a determination implicates questions of fact, for which our standard of review is deferential to the factfinder.  *See, e.g.*, *City of Philadelphia, to Use of Faith v. Stewart*, 51 A. 348, 349 (Pa. 1902) ("What the parties said and what they meant by what they said was for the jury to answer.  It was not

---

[11] *Amici* American Academy of Matrimonial Lawyers, Pennsylvania Chapter, Academy of Adoption & Assisted Reproduction Attorneys, and Pennsylvania Interbranch Commission for Gender, Racial, & Ethnic Fairness agree with Junior, and emphasize the Fairfax Cryobank contract designated Junior as a "Co-Intended Parent," demonstrating Glover's intent to bestow upon Junior the terms and conditions of that agreement.  *Amici* GLBTQ Legal Advocates & Defenders, National Center for Lesbian Rights, ACLU, ACLU of Pennsylvania, Family Equality, Mazzoni Center, Philadelphia Family Pride, and COLAGE also agree, and add context that LGBTQ+ parents are often advised to do a confirmatory adoption (even if they agree to parentage) to ensure full faith and credit of parentage in other jurisdictions, not to establish parentage in the home state.  *Amicus* Cordell & Cordell, P.C., agree a contract existed.

a written contract which one party maintained and the other sought to alter or contradict as argued. It was a mixed written and oral contract, the terms of which were disputed. . . . 'The construction of an oral agreement belongs to the jury[.]'") (citation omitted); *Wilson v. Lyle*, 16 A. 861, 861 (Pa. 1889) (where terms of oral contract were in dispute it raised a question for the jury); *Berry v. Eastman*, 40 A.2d 102, 103 (Pa. Super. 1944) ("The right of a broker to a commission is a matter of contract, express or implied, but whether there was such a contract was a question of fact to be determined by the trial judge."). *See also Field v. Golden Triangle Broadcasting, Inc.*, 305 A.2d 689, 691 (Pa. 1973) ("when the evidence is conflicting as to whether the parties intended that a particular writing would constitute a complete expression of their agreement it has been held that it is a question of fact for the trier of fact to determine whether a contract exists").

In contract cases, then, the fact-finder must evaluate whether the evidence establishes facts that could meet the requisite elements of a contract.[12] Here, the Superior Court recited those elements as "(1) mutual assent; (2) consideration; and (3) sufficiently definite terms." *Glover*, 306 A.3d at 911, *citing Helpin*, 969 A.2d at 610. By contrast, we have stated "[g]enerally, in order for a contract to be formed, there must be three requisite elements: an offer, acceptance, and consideration." *Estate of Caruso v. Caruso*, 322 A.3d 885, 896 (Pa. 2024), *citing Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 587 A.2d 1346, 1349 (Pa. 1991). *See also Farren v. McNulty*, 121 A. 501, 502 (Pa. 1923) ("It is a requisite of every contract that there must be an offer and acceptance"). These two different articulations of the requirements of a contract are not necessarily incompatible — Pennsylvania courts have explained that "[t]he principle that a contract is not binding unless there is an offer and an acceptance is

---

[12] Of course, once those facts are found, it becomes a question of law whether they satisfy the requisite legal elements.

to ensure that there will be mutual assent." *Hahnemann Med. College & Hosp. of Phila. v. Hubbard*, 406 A.2d 1120, 1122 (Pa. Super. 1979), *citing Farren*, 121 A. 501. But certainly, the Superior Court's articulation of the elements as requiring "mutual assent" cannot gut the requirements for an offer and an acceptance. General acquiescence to a course of conduct is not sufficient "mutual assent" to establish an oral contract; the parties must each know the terms of the contract and they must both assent to those terms, *i.e.*, there must be an "offer" and an "acceptance" as defined by our common law contract principles. *See, e.g.*, *Essner v. Shoemaker*, 143 A.2d 364, 366 (Pa. 1958) ("before preliminary negotiations ripen into contractual obligations, there must be manifested mutual assent to the terms of a bargain").

Also relevant, we review the concept of contractual consideration. We have explained "[c]onsideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Stelmack v. Glen Alden Coal Co.*, 14 A.2d 127, 128 (Pa. 1940) (citation omitted). We elaborated in *Stelmack* that "[t]he terms 'benefit' and 'detriment' are used in a technical sense in the definition, and have no necessary reference to material advantage or disadvantage to the parties." *Id.* We continued: "[i]t is not enough, however, that the promisee has suffered a legal detriment at the request of the promisor. **The detriment incurred must be the '*quid pro quo*', or the 'price' of the promise, and the inducement for which it was made.** 'Consideration must actually be bargained for as the exchange for the promise.'" *Id.* at 128-29, *quoting* Restatement Contracts §75 cmt. b (emphasis added). Thus, detriment alone does not establish consideration. *See id.* (distinguishing how detriment can be given gratuitously as a gift).

Mindful of these standards, we hold the lower courts erred in holding there was an oral contract in this case. In its Rule 1925(a) opinion, the trial court found a binding

agreement existed between the parties, but in explaining its rationale, addressed only the

parties' shared intent:

> In the instant matter, it is undisputed that the parties, a married couple, mutually agreed to utilize IVF for the purpose of having a child together. The parties jointly consulted with and executed contracts with a fertility clinic (RMA), a sperm bank (Fairfax Cryobank) and later a doula in preparation for childbirth. The Care Share contract signed by the parties with RMA identifies them as "Patient" and "Partner", while the contract with Fairfax Cryobank identifies them as "Intended Parent" and "Co-Intended Parent". Additionally, both Glover and Junior signed affidavits which memorialized their joint intent to have Junior adopt the child "in order to provide this child with the legal stability of two parents", intent for Junior to "become a legal parent, with rights equal to" Glover's, and the intent for Junior to have custodial rights and a child support obligation should the parties separate (N.T. at 31-35; *See also*, Exhibit "K").
>
> Based upon the undisputed evidence presented, the [c]ourt determined that it conclusively established that the parties, a married couple, formed a binding agreement for Junior, as a non-biologically related intended parent, to assume the status of legal parent to the Child through the use of [ART].

Trial Court Op. at 9-10. The trial court did not find any specific facts establishing an offer,

acceptance, or consideration between Glover and Junior.

The *en banc* Superior Court similarly erred. Its first misstep was defining the

contract issue as a pure legal question subject to a *de novo* standard and plenary scope

of review. *See Glover*, 306 A.3d at 910. It then viewed the record anew through that

broad lens to find facts supporting the essential elements of a contract, which it defined

as "(1) mutual assent; (2) consideration; and (3) sufficiently definite terms." *Id.* at 911.

*See also id.* at 913 ("An examination of the documents and testimony presented during

the evidentiary hearing reveals a sufficient basis, as evidenced by the agreements and

the conduct of the parties, to confer parentage on Junior.").

However, the Superior Court did properly affirm the trial court's finding the parties

mutually intended to conceive and raise a child together based on the extensive evidence,

including the various written contracts and statements indicating the expectation Junior

would be a parent. To be clear, we take no issue with that portion of its analysis, and agree the record abounds with evidence of the parties' shared intent. But, the Superior Court incorrectly used the fact of the parties' shared intent alone to satisfy the "mutual assent" element for an oral contract. *See id.* at 914-15 ("the certified record is replete with evidence of the parties' mutual assent to conceive a child of their marriage using ART, bestow upon Junior legal parent status, and raise the child together as co-parents"), *citing* Trial Court Op. at 9-10. Like the trial court, the Superior Court did not point to any fact establishing an offer or an acceptance of specific terms of an oral contract for shared parentage between Glover and Junior.

The Superior Court's next error was in its analysis of consideration. Initially, it defined consideration "as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Id.* at 915, *quoting Pa. Envtl. Def. Found.*, 255 A.3d at 305. It then determined Junior gave consideration to Glover based on testimony that: (1) "Junior confirmed paying for one-half of all the expenses, including fees associated with the preliminary medical tests, IVF, and hiring a doula to assist Glover during the birth[,]" *id.*, *citing* N.T. 5/3/2022, at 17, 44; and (2) "Junior also described the shared emotional role," including that Junior administered daily fertility injections into Glover's abdomen for three months and attended doctors' appointments, *id.* The Superior Court then dove further into the hearing transcript to find "Glover not only agreed to the shared financial and emotional burdens, she continued to assent to the arrangement even after doubting whether she was still committed to co-parenting with Junior." *Id.* It observed:

> Glover addressed this apparent dichotomy during the evidentiary hearing. She offered the following explanation for why, despite her apprehensions about continuing her romantic relationship with Junior, she nevertheless executed the fertility contracts identifying Junior as a co-parent rather than proceeding alone or forgoing the IVF program entirely: "I could've moved forward without having to do the [IVF] program. . . . Financially—it was the best decision."

*Id.* at 915-16 (alteration supplied by Superior Court), *quoting* N.T. 5/3/2022, at 65. From that portion of the transcript, the Superior Court determined: "[h]ence, the certified record bears out that, **in exchange for** the consideration of the shared emotional burden and equally-divided financial cost of the assistive reproductive procedure and birth, Glover agreed that her spouse, Junior, would possess parental rights to the child conceived through their combined efforts." *Id.* (emphasis added). Beside the point that the Superior Court essentially reached this finding of fact on its own (presumably using its self-declared plenary scope of review), its determination is questionable.

A closer look at Glover's statement at the hearing reveals the Superior Court's quotation lacks important context. The relevant exchange began with a discussion of the various written agreements, during which Glover testified she did not believe they would be binding to establish Junior's parentage. *See* N.T. 5/3/2022, at 64. Her counsel then asked: "Did you feel like you had any options within the sperm bank or with the fertility clinic, if you didn't sign those documents, to be able to move forward with the process?" *Id.* Glover responded affirmatively, and then clarified: "we could've moved forward without the program. I could've moved forward without having to do the CareShare program." *Id.* at 65. Counsel asked: "But you decided to do CareShare just to make sure you were getting —" to which Glover responded, "Financially . . . it was the best decision." *Id.* It is apparent from this context Glover was discussing how the CareShare program — which "allows for the possibility of multiple IVF cycles for a single fee and, under certain circumstances, provides a refund" — provided the most cost-effective means for the parties to conceive. RMA CareShare Agreement at 1. It is a reach to derive from this testimony that Glover entered into the CareShare program **in exchange for** the establishment of Junior's parentage. And while Junior certainly suffered the detriments

noted by the courts below, the trial court never found as fact that those detriments were part of a bargained-for exchange in order to establish shared parentage.

Despite finding the existence of an oral contract, the *en banc* Superior Court did not point to any evidence of a conversation between Glover and Junior where one party offered the deal (that Junior would support Glover financially and emotionally with conception and pregnancy and in exchange would have parental rights with respect to Child) and the other party accepted it. We do not fault the lower courts for this shortcoming, however, because it is entirely likely such a conversation never occurred. Common experience teaches that when married couples decide to have a baby together, whether by ART or not, they typically do not enter into contracts with each other. The same goes for the lack of evidence of consideration in this case; while couples who have a child together generally share the financial and emotional burdens, they do not do so as a **bargained-for exchange** for parentage and parental rights. A couple's decision to have a baby together is often profoundly intimate and may not be so easily reduced to a transaction.[13]

Operating within the existing framework established by our precedent, the lower courts (understandably) attempted to fit the facts of this case into the confines of contract law. But the present matter is inapposite to scenarios where parties conceive using

---

[13] We note the parties do not argue and the lower courts did not analyze whether a contract implied in fact existed. Although contracts implied in fact account for situations where parties did not communicate the terms of the contract expressly, such contracts must still be supported by consideration. *See, e.g.*, *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 659 (Pa. 2009) ("A contract implied in fact is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from acts in the light of the surrounding circumstances.") (citation omitted); *Thomas v. R.J. Reynolds Tobacco Co.*, 38 A.2d 61, 63 (Pa. 1944) ("The consideration necessary to establish a valid contract, express or implied in fact, must be an act, a forbearance, or a return promise, bargained for and given in exchange for the promise."). Our holding here does not affect our case law on implied contracts.

gamete donation or gestational carriers, which are more transactional in nature and thus more easily amenable to analysis using the legal elements of contract. *See Ferguson*, 940 A.2d at 1248[14]; *Baby S.*, 128 A.3d at 306-07. Although the lower courts ably concluded the parties shared a mutual intent that Junior would be a parent to Child, contract law simply does not account for the situation. We therefore reverse the lower courts' holdings that Junior established parentage through a contract.[15]

---

[14] In *Ferguson*, we explained the parties made clear their "mutual intention to preserve all of the trappings of a conventional sperm donation," thereby eliminating the sperm donor's parentage. We described how:

> the parties could have done little more than they did to imbue the **transaction** with the hallmarks of institutional, non-sexual conception by sperm donation and IVF. They negotiated an agreement **outside the context of a romantic relationship**; they agreed to terms; they sought clinical assistance to effectuate IVF and implantation of the consequent embryos, taking sexual intercourse out of the equation; they **attempted to hide [s]perm [d]onor's paternity from medical personnel, friends, and family**; and for approximately five years following the birth of the twins both parties behaved in every regard consistently with the intentions they expressed at the outset of their arrangement, **[s]perm [d]onor not seeking to serve as a father** to the twins, and [m]other not demanding his support, financial or otherwise.

*Ferguson*, 940 A.2d at 1246 (footnote omitted) (emphasis added). The facts of this case are, as explained, not a direct analogue to the sperm donation context. But it is striking to contrast the facts considered by the *Ferguson* Court to determine the sperm donor was not a parent. Here, the decision to conceive **was** made inside the context of a romantic relationship, Junior's identity as an intended parent **was** publicized to friends, family, and medical personnel, and Junior **did** seek to serve as a parent. This further undergirds our determination Junior's and Glover's joint decision to have a child was not a "transaction," it was far more akin to the decision to conceive a child naturally.

[15] We briefly note that we also reject Glover's argument the Jerner contract/affidavit reflect a binding agreement that Junior would become a parent only upon adoption and only if the parties remained married. While the affidavits stated they "intend[ed] to remain a committed couple[,]" this documentation of the parties' intentions did not condition Junior's parentage on an intact marriage. Glover Aff., 12/5/2021; Junior Aff., 12/5/2021. In fact, the affidavits contemplated what would happen if the parties were to split up in the future: "I understand that this means [Junior] will have custody rights and child support obligations to this child if we ever separate in the future[,]" and "[i]n the event of future litigation between me and [Junior], I consent to the release of this Affidavit to [Junior]." *Id.*

## B. Equitable Estoppel

### 1. Parties' Arguments

Glover argues the Superior Court exceeded its role by looking beyond the trial court's contract determination to hold in the alternative that relief was warranted under equitable estoppel principles. She argues the cases the Superior Court relied on were inapt: *L.S.K. v. H.A.N.* involved a situation where a person sought and obtained a court order for custody but tried to deny the duty of support. *See* 813 A.2d 872 (Pa. Super. 2002). And, in *C.T.D. v. N.E.E.*, the Superior Court remanded for a determination of whether a putative father abandoned his potential paternal responsibilities by waiting almost two years to try to establish paternity. *See* 653 A.2d 28 (Pa. Super. 1995). Glover argues *C.T.D.* weighs in her favor, as she claims Junior abandoned the marriage and Child after conception. Alternatively, Glover claims, the Superior Court did not support its finding of Junior's reasonable reliance, and that equity could easily be applied the opposite way to preclude Junior from claiming parentage. Lastly, Glover argues, equitable estoppel doctrines in the context of parenting and custody are based in the preservation of intact marriages; here, there is no intact marriage to protect.

In reply, Junior argues the Superior Court correctly applied equitable principles to hold Junior is a parent, in line with *C.T.D.* and *L.S.K.* Junior adds that under "principles of estoppel, 'a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as the [parent] of the child.'" Junior's Brief at 35, *quoting Brinkley*, 701 A.2d at 179. Junior asserts the "record is replete with examples of Glover's conduct accepting Junior as parent of the child." *Id.* at 35-36 (including the joint actions of the parties of conceiving Child and preparing for Child's arrival by, *e.g.*, picking out a name, taking pregnancy classes, announcing the pregnancy to family and friends, creating a registry, and making a co-parenting plan). According to

Junior, the record also demonstrates Junior's detrimental reliance and prejudice if Glover were allowed to deny parentage now; Junior paid for half of the expenses, entered the various contracts, and took on emotional burdens. *See id.* at 36-37.[16]

### 2. Analysis

Two equitable doctrines predominate in our law on parentage: the presumption of paternity/parentage and paternity/parentage by estoppel.[17] All agree the presumption of parentage does not apply here because the parties' marriage is no longer intact, and "[w]hen there is no longer an intact family or a marriage to preserve, then the presumption . . . is not applicable." *Glover*, 306 A.3d at 908, *quoting Vargo v. Schwartz*, 940 A.2d 459, 463 (Pa. Super. 2007). The Superior Court's cursory conclusion Glover was equitably estopped from challenging Junior's parentage appears to have been grounded in broad

---

[16] *Amici* American Academy of Matrimonial Lawyers *et al.* supplement with specific actions Glover took on which Junior detrimentally relied, including Glover's acceptance of financial and emotional support, Glover's agreement to use specific sperm based on the donor's commonalities with Junior, and Glover's affidavit stating she wanted Junior to be a legal parent. *Amici* GLBTQ Legal Advocates & Defenders *et al.* agree estoppel should bar Glover from contesting Junior's parentage and add that although the marital presumption has been limited to cases where the goal is to preserve an intact marriage, it also serves to protect children's parentage. Those *amici* remind the Court that in *Obergefell v. Hodges*, 576 U.S. 644 (2015), the United States Supreme Court recognized that the profound commitment of marriage plays a vital role in safeguarding children, and they ask the Court to revisit the limit on the marital presumption in this case where, without Junior's parentage, Child will not have a second parent. *Amicus* Cordell & Cordell, P.C. also agrees with Junior, adding that the family court is a court of equity and Pennsylvania has long applied equitable principles to determine parentage for the purpose of protecting children from harm and trauma.

[17] We note the Superior Court has applied the presumption of paternity to same-sex couples. *See Int. of A.M.*, 223 A.3d at 697 ("We . . . have no difficulty in holding that the presumption of paternity is equally as applicable to same-sex marriages as it is to opposite-sex marriages."). Because we do not dispose of this case on these equitable grounds, we need not decide whether the presumption of paternity or paternity by estoppel can apply under these circumstances. We do, however, recognize the broader terms "parentage by estoppel" and "presumption of parentage" are better suited to cases like this one, and use them in this opinion as necessary.

principles of equitable estoppel.  Importantly, however, we have held "paternity by estoppel continues to pertain in Pennsylvania, but it will apply only where it can be shown, on a developed record, that it is in the best interests of the involved child."  *K.E.M. v. P.C.S.*, 38 A.3d 798, 810 (Pa. 2012).  Here, the lower courts did not perform a best interests analysis, or address *K.E.M.* at all.  They certainly did not evaluate whether, in light of *K.E.M.*, a best interests analysis is necessary when determining parentage under an estoppel theory in these circumstances.

We observe, however, that a best interests analysis (as contemplated by the Court in the context of paternity by estoppel) would be difficult to engage in here, since this litigation commenced before Child was even born.  *See id.* at 809 (in discussing best interests, noting the relevance of the child's closeness with the challenged parent and whether harm would befall the child if parental status were to be undone).  Junior has not had the opportunity to build a relationship with Child.  Thus, as with the contract-based analysis *supra*, the present situation does not fit neatly within the estoppel box.  Although we do not foreclose the possibility that estoppel principles could apply more flexibly to establish parentage than our precedent currently reflects — indeed, these equitable principles inform our intent-based parentage analysis below — we cannot affirm the Superior Court's alternate holding given its fleeting discussion of equitable estoppel.  We proceed to the final question of intent-based parentage.

### C.    Intent-based Parentage

#### 1.    Parties' Arguments

According to Glover, "[t]his Court in *C.G.* made clear that it does not stand for the proposition that parentage can be established merely by intent in the setting of [ART] in the absence of specific contract provisions outlining the responsibilities and legal obligations of the non-related third party."  Glover's Brief at 24.  She claims intent was not

the focus of *Ferguson* or *Baby S.* because the parties in those cases formed "clear binding agreements with terms that left no doubt as to the rights and responsibilities of the parties." *Id.* at 25. She posits the Superior Court exceeded its authority when it reached its intent-based parentage holding, claiming its scope was limited to correcting errors regarding the trial court's determination a contract existed. Moreover, Glover argues, the lower courts focused on the wrong time period when finding mutual intent that Junior would be a parent. Glover claims that instead of focusing on the time around conception, the court should have considered Junior's conduct later in the pregnancy (when Junior moved into the basement, left for the West Coast for several months, then moved out of the marital residence). Glover argues the facts of this case are akin to *C.G.*, where the courts held the parties did not mutually intend to have and raise the child together. She claims the Superior Court ignored *C.G.* by using an intent-based approach.

Glover further contends the Court should refrain from adopting a doctrine of intent-based parentage, claiming it "is a slippery slope by which the role of parent would be potentially subjected to result-oriented applications." *Id.* at 38. Especially in cases like this one where the child was not yet born, Glover claims, the doctrine fails to protect the best interests of the child. She argues this area of the law requires certainty and consistency, and a nebulous intent-based standard will require case-by-case determinations, resulting in chaos, protracted litigation, and uncertainty for the children.

Junior responds that the Superior Court's examination of intent-based parentage does not conflict with *C.G.* Junior frames the lower court's opinion as "based on contract principles, referring to intent-based parentage only as a secondary reason[.]" Junior's Brief at 22-23. Nevertheless, Junior argues, the Court in *C.G.* did not "reject" intent-based parentage across the board, and this case is distinguishable on its facts. *Id.* at 23-24. Junior urges us to adopt an intent-based parentage doctrine for children conceived

through ART, noting "this case fits squarely in the situation anticipated by . . . *C.G.*" *Id.* at 24. Junior highlights the discussions of intent-based parentage in the *C.G.* concurrences, citing Justice Wecht's observation that in most cases, an intent-based analysis would reach the same result as a contract-based analysis, while providing refuge in circumstances where the specific requirements of contract could not be met. *See id.* at 26 (reciting Justice Wecht's hypothetical as nearly identical to this case). Junior concludes "it is time to expand the determination of parentage and adopt an intent-based approach" to fully recognize families created through alternative means. *Id.*

Junior avers this case is the perfect opportunity to adopt the doctrine of intent-based parentage. Junior recaps Glover's continuous representations of her intent to co-parent with Junior even after the parties separated, the references to Junior as "Co-Intended Parent" and "Partner" in the written contracts, the various decisions the parties made together regarding the conception and raising of Child, and the fact Junior acted like a parent. Junior agrees with the Superior Court that "this appeal is the paradigm of intent-based parentage in cases involving ART, where the couple not only evidenced their mutual intent to conceive and raise the child, but they also participated jointly in the process of creating a new life." *Id.* at 28, *quoting Glover*, 306 A.3d at 919.

Junior rebuffs Glover's arguments that intent-based parentage would create a "slippery slope" or lead to "chaos," explaining under Glover's view of the law, the pregnant parent would have complete control and could unilaterally strip the other of their parental rights, leaving the child with only one parent, contrary to public policy. *Id.* at 29-30. Junior asserts such a result would be "tragically unjust" for both the parent and child and would be "shocking in an opposite-sex marriage." *Id.* at 30. Junior then proposes a two-step standard for finding intent-based parentage: First, the court would ask if the parties are married and were married while they undertook ART. If so, Junior believes there should

be a rebuttable presumption that both parties intended to be the parents. Second, Junior continues, if the parties are not married, the court should ask whether there is proof of intent for the non-carrying party to serve as the other parent, which can be proved by evidence of (a) significant participation during the ART process (*e.g.*, attending doctors' appointments, signing contracts, giving injections, financially contributing); and (b) how the parties held themselves out to family, friends, and the public regarding the upcoming birth of the child (*i.e.*, whether they acted like they were having a baby together). According to Junior, such a "clear, reasonable standard" would protect against the situation at hand, where Child has been deprived of Junior's love and care, and Junior has been denied the ability to parent and know Child. *Id.* at 34.[18]

*Amici* American Academy of Matrimonial Lawyers, Pennsylvania Chapter *et al.* provide the Court with additional, exceptionally helpful arguments supporting the adoption of intent-based parentage. They first argue the doctrine would fill a significant gap in our law. *Amici* explain that our existing precedent allows "parentage for standing purposes [to] be proven in only four ways: biology, adoption, a presumption attendant to marriage, or 'legal parentage by contract [in ART cases].'" *Amici* Brief of Am. Acad. of Matrimonial Lawyers *et al.* at 6-7, *quoting C.G.*, 193 A.3d at 911 (Dougherty, J., concurring). But they

---

[18] *Amicus* Cordell & Cordell, P.C. argues for a similar two-step analysis:

> First, a marital presumption: if the parties are married during ART procedures, and at the time the child was conceived via ART, both parties are presumed to be the parents of the resultant child. Second, if the marital presumption does not apply, the party claiming parentage by intent must provide clear and convincing evidence demonstrating both a mutual intent to conceive and raise the child (such as communications between the parties, how they held themselves out, documents they executed, etc.) as well as joint participation in the process of creating new life (such as the party's name listed on paperwork, assistance for hormone injections, attendance at and/or payment for related medical services, etc.).

*Amicus* Brief of Cordell & Cordell, P.C. at 23-24.

note the *C.G.* majority recognized the possibility of future expansion of the meaning of "parent," and they argue that even these four categories represent a significant expansion of the term as it was understood at the end of the last century. *See id.* at 7-11 (describing how the courts' development of parentage by contract, and the Superior Court's expansion of the presumption of parentage to the ART context, including for same-sex married couples,[19] moved the law forward).

*Amici* explain, however, these doctrinal developments are still too narrow to cover all families who conceive through ART. They observe that express contracts regarding parental rights typically occur in only two contexts: gamete donation and surrogacy. "But there is little perceived need for two intended parents to enter into a written contract **with each other** to provide that the non-biological parent will have parental rights." *Id.* at 11 (emphasis in original). And while the marital presumption could apply if the parties were married, *amici* explain it would not apply if the marriage dissolves before an action is filed challenging the non-biological parent's status (as in this case). To fill this gap, *amici* ask the Court to adopt an intent-based standard for determining parentage, "under which Pennsylvania courts probe the intent of the person undergoing ART and their partner, and to ask whether, at the time of the conception, that couple intended to bring a child into the world together and to serve as co-parents to that child." *Id.* at 13. They assert the courts should be permitted to look at evidence from all relevant time periods (including conception, pregnancy, or after birth if applicable), and make factual determinations on a case-by-case basis. According to *amici*, intent-based parentage is a logical continuation of our ART jurisprudence. They explain the existing doctrines (especially the contract-

---

[19] *See Int. of A.M.*, 223 A.3d at 694-95.

based approach) already aim to capture the parties' intent, but they do so imperfectly in certain situations.[20]

Next, *amici* argue an intent-based parentage doctrine would best serve the Commonwealth's public policies. First, they explain the Commonwealth aims to protect the stability of children's family lives. *See id.* at 15-16, *citing* 23 Pa.C.S. §5328(a)(4) (custody court should consider "[t]he need for stability and continuity in the child's education, family life and community life"). *Amici* elaborate that to serve that aim, Pennsylvania law (1) limits instances where a single-parent family is created, and (2) facilitates the addition of a parent so a child has two parents. *See id.* at 16-18.[21] Second, they argue it is the Commonwealth's policy to recognize Pennsylvanians may exercise a diverse range of parental configurations without undue intrusion from the courts. *See id.* at 19, *citing* 23 Pa.C.S. §2312 ("Any individual may become an adopting parent."); *Ferguson*, 940 A.2d at 1248 (recognizing a single-parent family where it was mindfully created). Third, *amici* argue a prevalent common law policy is to encourage predictability of legal outcomes. *Amici* believe intent-based parentage would support all three policy

---

[20] *Amici* Philadelphia Bar Association, Pennsylvania Bar Association, and Allegheny County Bar Association agree that a gap exists in Pennsylvania law, which creates uncertainty for families. They recognize there is currently pending legislation in the General Assembly to adopt the Uniform Parentage Act (and thus recognize intent-based parentage). But *amici* nonetheless urge the Court to adopt a common law intent-based parentage doctrine in this case, reasoning the question is too urgent to await legislative action.

[21] *Amici* explain the Adoption Act does not permit a parent to move to involuntarily terminate the other parent's parental rights without another person willing and available to adopt the child, *see Amici Brief* of Am. Academy of Matrimonial Lawyers *et al.* at 16 (citing, *e.g.*, 23 Pa.C.S. §2512(b)); the Adoption Act permits stepparent and second-parent adoptions, *see id.* at 17 (citing, 23 Pa.C.S. §2903; *In re Adoption of R.B.F.*, 803 A.2d 1195, 1196 (Pa. 2002)); and the courts that have refused to apply the marital presumption in cases of marital breakdown have done so with the intention a person other than the husband will be identified as the child's father, not to strip the child of a second parent, *see id.* at 18 (citing, *e.g.*, *Minnich v. Rivera*, 506 A.2d 879, 882 (Pa. 1986)).

goals by: establishing parentage for those who, in their own view, are best positioned to care for a child; ensuring children born by ART are not disadvantaged relative to children born in non-ART situations when a marriage is irretrievably broken (noting in the ART context, there is no other substitute parent); thwarting the use of parentage proceedings by an embittered party to a breakup; and fostering predictable outcomes, especially for lay-parents who would not need to understand the complexities of contract law to know where they stand (thereby discouraging protracted, exploitative litigation over ambiguous contracts).

Finally, *amici* observe intent-based parentage is a settled doctrine used by other states in their common law and in the Uniform Parentage Act (UPA), and Pennsylvania would not be an outlier by adopting it. *Amici* urge the Court to join the growing ranks of states that use intent-based parentage, and argue this is the perfect case to do so. *Amici* GLBTQ Legal Advocates & Defenders *et al.* supplement this point with more statistics from other jurisdictions. They explain it is "the overwhelming consensus across the states" that "mutual consent to [ART] leads to conclusive legal parentage." *Amici* Brief of GLBTQ Legal Advocates & Defenders *et al.* at 13-14. They identify certain cases from other jurisdictions applying intent-based reasoning (discussed further *infra*) and assert many states have enacted intent-based parentage statutes. *See id.* at 14 n.7 (arguing sixteen states have intent-based parentage provisions, and nineteen have ART parentage provisions), *citing* Courtney G. Joslin *et al.*, *Lesbian, Gay, Bisexual & Transgender Family Law* §3:3 (2018).[22]

---

[22] *Amici* further explain the UPA provisions have evolved to establish parentage in the context of ART, first applying to consenting spouses, then protecting nonmarital children born through ART and expanding the ways consent can be established, as well as updating provisions with gender-neutral language to make clear they apply to children born to LGBTQ+ parents who use ART. *See Amici* Brief of GLBTQ Legal Advocates & Defenders *et al.* at 14-16.

### 2. Analysis

After considering the thorough advocacy described above, we adopt a doctrine of intent-based parentage, not out of whole cloth, but as an extension of our existing parentage jurisprudence. As we explained in *C.G.*, our precedent up to this point recognizes parentage through four paths: biology, adoption, equity (*i.e.*, parentage by a marital presumption or estoppel), or by contract where the child is born using ART. *See C.G.*, 193 A.3d at 906. But in *C.G.*, we acknowledged "the reality of the evolving concept of what comprises a family cannot be overlooked." *Id.* at 900, *citing J.A.L. v. E.P.H.*, 682 A.2d 1314, 1320 (Pa. Super. 1996) ("increased . . . changes in social mores and increased individual freedom have created a wide spectrum of arrangements, filling the role of the traditional nuclear family"). In conformity with that observation, we made clear "nothing in [the Court's] decision is intended to absolutely foreclose the possibility of attaining recognition as a legal parent through other means." *Id.* at 904 n.11. Thus, while an intent-based analysis did not suit the facts in *C.G.*, our decision there did not preclude intent-based parentage in Pennsylvania. *See id.* ("we must await another case with different facts before we may properly consider the invitation to expand the definition of 'parent'"), *quoting id.* at 913 (Dougherty, J., concurring). We are now presented with the appropriate opportunity to apply these principles.

As illustrated, none of the four paths to parentage recognized in *C.G.* account for the factual scenario in this case. Junior does not share genetics with and did not gestate Child, so there is no biological relationship. Junior's relationship with Glover broke down and this litigation commenced before Child was born, so there was no opportunity to adopt. Likewise, the presumption of parentage attendant to marriage applies only to intact marriages, so Junior could not establish parentage through the marital presumption. And application of parentage by estoppel is problematic in this case since our precedent

requires a best interests analysis, and Junior has been prevented from forming a relationship with Child. Finally, contract principles are inapt because married couples generally do not engage in a transaction involving offer, acceptance, and consideration when deciding to have children. Nonetheless, we are presented with a situation where a formerly married couple endeavored — while still married — to conceive and raise a child together, and they invested many months and significant financial, emotional, and physical resources to jointly bring a child into the world. Indeed, this case is a near-exact materialization of Justice Wecht's prescient hypothetical in *C.G. See id.* at 915-16 (imagining a same-sex couple who used ART to conceive, where the non-biological parent lacks a contract establishing parentage, the parties separate before an adoption is formalized, and even third-party *in loco parentis* standing cannot be established because the parties separated before or shortly after birth).

To determine whether parentage in such situations accords with our current law, it is helpful to consider what our law concerning legal parentage aims to accomplish in the first place. Foremost, Pennsylvania law plainly seeks to protect children. *Cf. C.G.*, 193 A.3d at 909 ("The paramount concern in child custody cases is the best interests of the child."). In *K.E.M.*, for example, when discussing paternity by estoppel, we adopted the stance that "the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized[,]" and took into account whether the child would "be denied the love, affection and support" of a parent. 38 A.3d at 807-08, *quoting Commonwealth ex rel. Gonzalez v. Andreas*, 369 A.2d 416, 419 (Pa. Super. 1976); *see also id.* at 808-09 ("we are of the firm belief — in terms of common law decision making — [the best interest of the child] remains the proper, overarching litmus, at least in the wider range of cases. . . . The legal determination of parentage is a hollow one where the accoutrements do not inure to a child's benefit.").

In furtherance of that goal, we have emphasized the importance of love and stability for the child. *See, e.g.*, *Int. of K.T.*, 296 A.3d 1085, 1106 (Pa. 2023) (in the context of termination proceedings, statutory considerations of emotional needs and welfare include "intangibles such as love, comfort, security, and stability"), *quoting In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also K.E.M.*, 38 A.3d at 809 ("The legal fictions perpetuated through the years . . . retain their greatest force where there is truly an intact family attempting to defend itself against third-party intervention."). And, of course, our law aims to protect children by providing private sources of financial support. *See, e.g.*, *Knorr v. Knorr*, 588 A.2d 503, 505 (Pa. 1991) (Parents' "right to bargain for themselves is their own business. They cannot in that process set a standard that will leave their children short. . . . When [their bargain] gives less than required or less than can be given to provide for the best interest of the children, it falls under the jurisdiction of the court's wide and necessary powers to provide for that best interest.").

On the other hand, legal parentage also serves the rights of parents themselves. "The liberty interest . . . of parents in the care, custody, and control of their children []is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925) ("liberty of parents and guardians" includes "direct[ing] the upbringing and education of children under their control"). Recently, in *Caldwell v. Jaurigue*, we considered what it means to be a "parent" for purposes of the child support statute in 23 Pa.C.S. §4321(2). *See* 315 A.3d 1258 (Pa. 2024). In that case, a deceased mother's paramour had formed a close, step-parent-like relationship with her child, and he sought and obtained partial physical custody after the mother's death, while the child's biological father shared physical custody and retained full legal custody. The father brought a support action against the paramour, relying on a case, *A.S. v. I.S.*, 130 A.3d 763 (Pa.

2015), where we held an ex-step-father owed a duty to support where he "litigated and obtained full legal and physical custody rights . . . [and] ha[d] insisted upon and bec[o]me a full parent in every sense of that concept." *Id.* at 1267, *quoting A.S.*, 130 A.3d at 770. Analyzing relevant statutes, dictionary definitions, and case law, we held the paramour was not a "parent" for purposes of a support obligation under Section 4321(2) because he did not have legal custody of the child, even though he was awarded substantial physical custody. We explained that without legal custody — *i.e.*, "[t]he right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions[,]" 23 Pa.C.S. §5322 — the paramour did not have all the rights and corresponding obligations of parentage. *Id.* at 1273-74. We held "without the power to decide the monumental facets of a child's life such as their medical treatment, religion, or course of education, the non-parent's role is plainly subordinate to that of a parent." *Id.* at 1275. Thus, Pennsylvania law primarily aims to protect the interests of children, and accordingly recognizes parentage encompasses duties and obligations as well as privileges.[23]

_____

[23] As explained by *amici* American Academy of Matrimonial Lawyers *et al.*, our law furthers these broad interests (and others) in various ways. *Amici* are correct that while our law respects single-parent households, *see, e.g.*, *Ferguson*, *supra*, there are quite a few instances where the law acts to promote two legal parents as a means of providing stability and more support for the child. *See, e.g.*, 23 Pa.C.S. §2512(b) (requiring a parent moving to involuntarily terminate the other parent's parental rights to aver they will assume custody of the child until the child is adopted); *In re Adoption of M.R.D.*, 145 A.3d 1117, 1120 (Pa. 2016) ("petitioning parent must demonstrate that an adoption of the child is anticipated in order for the termination petition to be cognizable"); 23 Pa.C.S. §2903 (permitting second parent adoption by spouse without requiring recognized parent to terminate their parental status); *In re Adoption of R.B.F.*, 803 A.2d at 1196 (allowing second-parent adoption among non-spouses in some situations where section 2903 is inapplicable). *Amici* are likewise correct our law aims to encourage predictable outcomes and account for even non-traditional family formations and structures. *See, e.g.*, *C.G.*, 193 A.3d at 903 ("cognizant of the increased availability of reproductive technologies to assist in the conception and birth of children, the courts are recognizing that arrangements . . . may differ and thus should be treated differently than a situation where (continued…)

An intent-based parentage analysis in ART cases would not conflict with these public policies; indeed, it would further them. In terms of stability and support, intent-based parentage in the ART context could provide a second source of love, care, and support — both emotional and financial. Unlike in estoppel cases, in the ART context, there is typically no second biological parent since a gamete donor would have contracted away parental rights. And it is apparent that in some ways, parents who conceive using ART essentially demonstrate their stability and dedication to a child by going through a more rigorous, time consuming, and expensive process to conceive a child than do many parents who conceive through sexual intercourse. At the same time, it is difficult to see how intent-based parentage would undermine more "naturally" derived parental rights. Parental rights are legally shared in the most ordinary circumstances of conception; in this more unusual context, the biological parent cannot reasonably expect to have sole parental rights when she and her partner plan to conceive and co-parent a child, and work together to bring that child into the world using ART. As we explained in *Caldwell* (albeit in the context of the support statute), parentage involves "the power to decide the monumental facets of a child's life such as their medical treatment, religion, or course of education." 315 A.3d at 1275. Certainly, one of the most monumental decisions a parent can make for their child is whether to conceive them in the first place.

Thus, an intent-based analysis aligns with the purposes of establishing parentage that pervade our law. And as demonstrated, cases like this one slip through the cracks

---

a child is the result of a sexual encounter"); *J.A.L.*, 682 A.2d at 1320 ("In today's society, where increased mobility, changes in social mores and increased individual freedom have created a wide spectrum of arrangements filling the role of the traditional nuclear family, flexibility in the application of standing principles is required in order to adapt those principles to the interests of each particular child.").

that separate the four paths to parentage named in *C.G.*[24]  *See* Douglas NeJaime, *The Nature of Parenthood*, 126 YALE L.J. 2260, 2289 (2017) ("[E]ven as principles of gender and sexual-orientation equality have animated shifts in parental recognition, parentage law continues to draw distinctions that carry forward legacies of inequality embedded in frameworks forged in earlier eras.").  It is time our precedent evolves to fill in the gap.

Addressing similar issues, courts in other jurisdictions have used intent-based considerations when determining parentage.  In *Sinnott v. Peck*, for example, the Supreme Court of Vermont considered a family court's dismissal of a plaintiff's petition to establish parentage of two children legally adopted by her same-sex domestic partner.  *See* 180 A.3d 560, 561 (Vt. 2017).  It affirmed the dismissal as to the older child the defendant partner adopted before the parties' relationship began, but reversed as to the younger child the couple decided to adopt and raise together during the course of their relationship.  *See id.* at 561-62 (explaining the adoption agency did not allow same-sex adoptions, so only defendant legally adopted the child).  The Vermont court explained its "past decisions with respect to the definition of 'parent,' and access to the rights and responsibilities that come from that status, have created a legal framework in which parental status is viewed in the absence of a marriage, civil union, or biological or adoptive relationship with the child in a narrow class of cases **in which the parents intended to bring a child into their family and raise the child together**, and in fact did so." *Id.* at 563 (emphasis added).  It explained "[t]his approach is not only consistent with [its] caselaw concerning parental rights, but it also furthers the core purpose of Vermont's

---

[24] Of course, this case is not the only scenario where rightful parentage could fall through those cracks.  Imagine, for example, a couple (same- or opposite-sex) who uses ART to conceive a child, but one intended parent changes their mind after conception, and attempts to avoid all parental responsibilities and leave the other partner holding the proverbial bag.  Or imagine a scenario where a couple uses ART to conceive, but the partner who is pregnant dies during childbirth.  Such cases would implicate the same roadblocks encountered here.

statutes relating to parent-child relationships, which is promoting the welfare of children, and it is supported by the weight of persuasive authority on this issue." *Id.*

To reach that conclusion, Vermont's high court examined its existing precedent, which it determined stood for "the proposition that in a narrow class of cases in which there is no competing claimant, parental status can flow from the mutual agreement and actions of the established legal parent and a putative second parent even in the absence of a marriage or a civil union between the parents or a biological connection between putative parent and child." *Id.* at 564. It relied on its earlier decision establishing unmarried same-sex couples could avail themselves of second-parent adoptions without one parent having to terminate parental rights, explaining the precedent established legal parent status may arise from mutual agreement and joint conduct of a legally recognized parent and intended second parent, and Vermont statutes are intended to promote the welfare of children. *See id.* at 564-65, *citing In re B.L.V.B.*, 628 A.2d 1271 (Vt. 1993).

*Sinnott* also relied on *Miller-Jenkins v. Miller-Jenkins*, 912 A.2d 951 (Vt. 2006), a case where a same-sex couple who conceived a child through donor insemination during their civil union disputed the nonbiological mother's parentage. The *Sinnott* court explained how *Miller-Jenkins* did not provide mere parent-like rights to the nonbiological mother based on equitable grounds but rather full-on legal parentage. It reasoned *Miller-Jenkins* established important analytical steps, *i.e.*, that Vermont's statutes did not limit parentage in these situations, and that parentage here was not dependent upon marital or civil union status alone, but was supported by a series of factors including: mutual intention that both parties would co-parent the child, the nonbiological mother's participation in the decision to conceive the child, that they both treated the nonbiological mother as a parent, and there was no other person claiming to be a parent. The *Sinnott*

court explained, on the other hand, that it had also rejected broad theories of *de facto* parentage that would allow **any** former domestic partner to establish parentage.

From that line of case law, the Vermont court derived a narrow framework allowing for non-biological parentage where "a child would otherwise have only one legally recognized parent, the legally recognized parent (usually a biological parent) and the other intended parent have mutually agreed to bring a child into their family to raise the child together as equal co-parents, and the parents have in fact done so." *Id.* at 567-68. It explicitly distinguished its precedent disallowing broad, *de facto* parentage for non-biological third parties based on "the joint decision of . . . parents to bring a child into their home in the first place and their joint conduct in doing so." *Id.* at 568. It explained this "focus[] on the pre-conception agreement of the parents would promote the welfare of children without undermining parental rights[,]" elaborating that limiting parentage to only the biological parent "would have dire consequences for many children," who could be denied a continued relationship and financial support from the second parent. *Id.* at 568-69. It further explained the biological parent's rights would not be diminished, reasoning "where a parent jointly plans and conceives a child with a partner, with the mutual intent and agreement to raise that child together, that parent has no reasonable expectation of sole parental rights in the event of a breakup." *Id.* at 569. Finally, the *Sinnott* court recognized its framework accorded with the modern trend of other jurisdictions. *See id.* at 569-72.[25]

---

[25] *See also, e.g.*, *In re Baby Doe*, 353 S.E.2d 877, 878 (S.C. 1987) ("a husband who consents for his wife to conceive a child through artificial insemination, **with the understanding** that the child will be treated as their own, is the legal father of the child born as a result of the artificial insemination and will be charged with all the legal responsibilities of paternity, including support") (emphasis added); *People v. Sorenson*, 437 P.2d 495, 499 (Cal. 1968) ("[A] reasonable man who, because of his inability to procreate, actively participates and consents to his wife's artificial insemination in the hope that a child will be produced whom they will treat as their own, knows that such (continued…)

Much like the *Sinnott* court, we hold the gap in our law is properly filled by an analysis of parentage focused on intent, since intent already serves as a beacon in our existing jurisprudence. Our current law clearly establishes biology is not the end-all-be-all when it comes to furthering the interests of legal parentage.[26] Although the proliferation of DNA testing offers an increasingly easy way to identify biological parentage, adoption, ART contracts, and the presumption/estoppel doctrines provide for (if not encourage) parentage that explicitly ignores genetics in some cases.[27] In the

behavior carries with it the legal responsibilities of fatherhood and criminal responsibility for nonsupport. One who consents to the production of a child cannot create a temporary relation to be assumed and disclaimed at will, but the arrangement must be of such character as to impose an obligation of supporting those for whose existence he is directly responsible. As noted by the trial court, it is safe to assume that without defendant's active participation and consent the child would not have been procreated."); *Brooks v. Fair*, 532 N.E.2d 208, 213 (Ohio Ct. App. 1988) ("we do not believe that when [mother] became artificially inseminated she intended the relationship between [non-biological father] and [child] to be temporary").

[26] *Cf. Lehr v. Robertson*, 463 U.S. 248, 260 (1983) ("Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring."), *quoting Caban v. Mohammed*, 441 U.S. 380, 397 (1979) (Stewart, J., dissenting); NeJaime, 126 YALE L.J. at 2290 ("tethering parenthood to biological ties perpetuates the exclusion of same-sex couples, who necessarily include a parent without a gestational or genetic connection to the child").

[27] In addition to these common law precepts, our General Assembly has enacted statutes reflecting that biological truth can be overlooked in some circumstances, even in the absence of marriage. As discussed, there are limited instances where parties can obtain second-parent adoptions even if they are not married. *In re Adoption of R.B.F.*, 803 A.2d at 1196; *cf. Sinnott*, 180 A.3d at 565 (reasoning prior case holding second-parent adoptions available to unmarried couples established, *inter alia*, "the [c]ourt's recognition that biology and marriage are not the only indicia of family formation that are worthy of judicial recognition[,] . . . and that our statutes should be construed to bring the recognized framework of our domestic relations laws to families as we find them"). Also, for example, 23 Pa.C.S. §5103 allows for voluntary acknowledgment of paternity of children born to unmarried women, providing:

> The father of a child born to an unmarried woman may file with the Department of Public Welfare, on forms prescribed by the department, an acknowledgment of paternity of the child which shall include the consent of the mother of the child, supported by her witnessed statement subject to 18

(continued…)

absence of that default biological tether between parent and child, all of these doctrines countenance the parties' intent, at least to some extent. For instance, a person seeking to adopt a child must file a petition for adoption, which "shall set forth . . . [t]hat it is the desire of the petitioner or the petitioners that the relationship of parent and child be established between the petitioner or petitioners and the adoptee." 23 Pa.C.S. §2701. Accordingly, the prospective adoptive parent must confirm an intention to parent the child.

Intent also informs application of the doctrine of parentage by estoppel. We have acknowledged "estoppel in paternity actions is aimed at achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding the paternity of the child." *Fish v. Behers*, 741 A.2d 721, 723 (Pa. 1999) (quotation marks and citation omitted). Parentage by estoppel accounts for the parties' intentions by looking at their past conduct in relation to the child: "the doctrine of estoppel embodies the fiction that, regardless of biology, in the absence of a marriage, the person who has

---

Pa.C.S. §4904 (relating to unsworn falsification to authorities). In such case, the father shall have all the rights and duties as to the child which he would have had if he had been married to the mother at the time of the birth of the child, and the child shall have all the rights and duties as to the father which the child would have had if the father had been married to the mother at the time of birth.

23 Pa.C.S. §5103(a) (footnote omitted). The statute further provides:

Notwithstanding any other provision of law, an acknowledgment of paternity shall constitute conclusive evidence of paternity without further judicial ratification in any action to establish support. The court shall give full faith and credit to an acknowledgment of paternity signed in another state according to its procedures.

*Id.* at §5103(d). The form itself instructs parents: "By signing this Acknowledgment of Paternity form, you give up the right to genetic testing to determine paternity, unless you cancel the Acknowledgment in writing within 60 days of signing the form." Acknowledgment of Paternity, Form PA/CS 611, *available at* https://www.humanservices.state.pa.us/CSWS/csws/forms/PA-CS-611%20Form.pdf#page=1.

cared for the child is the parent." *Brinkley*, 701 A.2d at 180; *see also Jones v. Trojak*, 634 A.2d 201, 206 (Pa. 1993) ("under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as the father of the child"); *John M. v. Paula T.*, 571 A.2d 1380, 1386 (Pa. 1990) ("estoppel cases indicate that where the principle is operative, blood tests may well be irrelevant, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted") (emphasis omitted).[28]

In fact, a handful of other jurisdictions have used equitable estoppel principles to incorporate the parties' intent into questions of parentage in ART cases. For example, in *Strickland v. Day*, the Supreme Court of Mississippi considered a case where a married same-sex couple, Kimberly and Christina, decided to conceive using artificial insemination and an anonymous sperm donor, and Kimberly served as the gestational mother and provided the ovum. *See* 239 So.3d 486, 487-88 (Miss. 2018). After the parties split up and disputed the status of Christina's parentage, the Mississippi court determined Kimberly was equitably estopped from arguing Christina was not a legal parent. It relied on evidence implicating the parties' intent, including that "Kimberly made numerous representations that Christina was an equal coparent . . . [and] signed an agreement at the clinic acknowledging the couple's joint intention to undergo the AI procedure." *Id.* at 493. Additionally, "the couple sent out birth announcements that read: 'Hatched by Two Chicks. Chris[tina] and Kimberly proudly announce the birth of their son.'" *Id.* The court rejected Kimberly's arguments she was planning on having a child on her own regardless of her marital circumstances, citing evidence that Kimberly allowed

---

[28] To a lesser extent, the presumption of parentage attendant to marriage also accounts for the parties' intent. Since the presumption applies only in cases with an intact marriage, for it to attach the biological/recognized parent and putative parent must intend to continue raising the child together as a cohesive family unit.

Christina to take part in the conception process, the couple discussed the possibility of Christina carrying the baby, and the birth announcement represented them both as parents. The court explained "[t]his further evidence[d] the couple's plan to undertake the role of parenthood together," and that there was "strong evidence of Kimberly's position regarding Christina's coparent status." *Id.* at 494. Thus, the Mississippi high court held equitable estoppel applied "where there was ample evidence the then-married couple **jointly and intentionally agreed** to have [a child] through the use of [artificial insemination]." *Id.* (emphasis added).[29] Like the *Strickland* court, we see estoppel principles as directly related to parties' intent.

The parties' intent is also the crux of the analysis when assessing parentage by contract in the ART context. The whole point of contract law is to effectuate the intent of

---

[29] *See also Levin v. Levin*, 645 N.E.2d 601, 603-04 (Ind. 1994) (husband equitably estopped from denying legal parentage where he and wife agreed to conceive using ART, reasoning, *inter alia*, he induced wife to go forward with ART and consented orally and in writing to procedure); *Laura WW. v. Peter WW.*, 856 N.Y.S.2d 258, 262 (N.Y. App. Div. 2008) ("situations will arise where not all of the[] statutory conditions are present, yet equity and reason require a finding that an individual who participated in and consented to a procedure intentionally designed to bring a child into the world can be deemed the legal parent of the resulting child"); *Brown v. Brown*, 125 S.W.3d 840, 841-43 (Ark. Ct. App. 2003) (father equitably estopped from denying parentage/support obligation for twins conceived using ART during marriage even though he did not sign statutorily required consent, relying on trial court findings: "(1) that [father] knew [mother] was going to get the sperm; (2) that [father] never said he would not consent to the procedure being performed and he signed the documents that were placed in front of him; (3) that [father] helped pick out the donor for the sperm; (4) that he allowed his name to be used on the birth certificate; (5) that after the children were born, he recognized them as his children; [and] (6) that it was only after [mother] began to talk about divorce that he decided he should not be responsible for the children"); *In re Marriage of Buzzanca*, 72 Cal. Rptr. 2d 280, 287 (Cal. Ct. App. 1998) ("Estoppel is an ungainly word . . . expressing the law's distaste for inconsistent actions and positions — like consenting to an act which brings a child into existence and then turning around and disclaiming any responsibility."); *R.S. v. R.S.*, 670 P.2d 923, 928 (Kan. Ct. App. 1983) ("[A] husband who with his wife orally consents to the treating physician that his wife be heterologously inseminated for the purpose of producing a child of their own is estopped to deny that he is the father of the child, and he has impliedly agreed to support the child and act as its father.").

the parties. *See, e.g.*, *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) ("It is . . . well established that under the law of contracts, in interpreting an agreement, the court must ascertain the intent of the parties."); *C.G.*, 193 A.3d at 915 (Wecht, J., concurring) ("Viewed through the lens of the parties' intentions, the *Ferguson* and *Baby S.* cases arrive at the same destination reached *via* a contract-based analysis."). Applying contract law to establish parentage in cases where parties have used ART, this Court has explicitly recognized the intent of the parties may override biological realities. In *Ferguson*, by holding ART contracts enforceable, we established Pennsylvania public policy accounts for "the evolving role played by alternative reproductive technologies in contemporary American society." 940 A.2d at 1245. Our analysis in *Ferguson* makes clear Pennsylvania public policy does not forbid the prioritization of parents' intent over genetics and biology in the context of ART. We recognized that allowing Pennsylvanians flexibility to use "all manner of arrangements . . . couched in contracts or agreements of varying degrees of formality" better allows the "increasing number of would-be mothers who find themselves either unable or unwilling to conceive and raise children in the context of marriage [to] turn[] to donor arrangements to enable them to enjoy the privilege of raising a child or children[.]" *Id. See also Baby S.*, 128 A.3d at 306 (imposing legal parentage on nonbiological mother who contracted with gamete donor and gestational carrier in accordance with recorded intent to parent the child).

We acknowledged in *Ferguson* that when parties act upon their intentions to conceive a child, they create real-world consequences. We explained, "[t]his Court takes very seriously the best interests of the children of this Commonwealth, and we recognize that to rule in favor of [s]perm [d]onor in this case denies a source of support to two children who did not ask to be born into this situation." *Ferguson*, 940 A.2d at 1248. We recognized the fact that, "[a]bsent the parties' agreement, however, the twins would not

have been born at all, or would have been born to a different . . . sperm donor." *Id. See also Baby S.*, 128 A.3d at 306 ("Baby S. would not have been born but for [a]ppellant's actions and express agreement to be the child's legal mother."). Similarly here, Child would not have been born if Glover and Junior had not intentionally endeavored together to conceive and raise a child. Indeed, the parties chose their specific sperm donor based on his similarities to Junior, and conceived Child at a specific time and place based on the context of their relationship and joint contributions to the ART process. Even if Glover chose to conceive a child by herself, it is highly unlikely the same exact sperm and ovum would have been used. Thus, Child exists because of **both** Glover and Junior. And unlike in *Ferguson*, allowing for intent-based parentage does not require the Court to reckon with the denial of a source of support for the child; it has the exact opposite effect, imposing parental rights **and duties** on both parents.

Having demonstrated that intent drives the analysis when applying our existing parentage doctrines, and that intent-based parentage accords with public policy, we hold that parentage may be established by proof of intent shared by two parties to use ART to conceive and co-parent a child together, even without meeting all the formalities of contract law. *Cf. Sinnott*, 180 A.3d at 563 ("This approach is not only consistent with our caselaw concerning parental rights, but it also furthers the core purpose of Vermont's statutes relating to parent-child relationships, which is promoting the welfare of children, and it is supported by the weight of persuasive authority on this issue."). We will not require those parents who use ART to transact or bargain **with each other**. The decision made within a loving couple to have a baby is generally not a *quid pro quo*, and we decline to put courts in the position of parsing through couples' actions to determine whether they were done gratuitously or as an exchange for consideration. We prefer to recognize a more dignified means to establish parentage for couples who use ART to conceive.

Contrary to the two-step standard Junior advocates for, however, we do not go so far as to adopt a new marital presumption for purposes of the intent-based parentage analysis. Certainly, the fact a couple is married at the time they decide to conceive a child will typically weigh in favor of finding they intended to conceive and raise the child together. And we do not foreclose the possibility that as our common law develops pursuant to this doctrine, intent in those situations may be deemed so prevalent as to warrant the adoption of a presumption. But we need not make that pronouncement today, where the record contains extensive evidence of the parties' intent. Instead, it is enough to say that courts undertaking an intent-based parentage analysis should consider all evidence from all relevant time periods — including, when applicable, pre-conception, during conception, during gestation, during birth, and post-birth — to determine whether the parties jointly undertook ART intending to conceive and co-parent the child together.

We reiterate the record here is replete with evidence to support the lower courts' holdings the parties mutually intended to bring Child into the world and raise him together, and that Junior participated in that process. Among other things, Glover and Junior jointly entered into multiple contracts pertaining to the conception and birth of Child, and Junior was even listed as a "Co-Intended Parent" in the Fairfax Cryobank contract. Junior played an active role in selecting the sperm donor, and the couple chose a donor based on his similarities to Junior. Junior shared equally in the costs of conceiving Child and assisted Glover with the IVF process by administering injections and attending doctors' appointments. They planned a baby shower together and picked out a name for the baby. But perhaps most cogently, both Glover and Junior signed affidavits stating their intentions plainly. Glover attested, *inter alia*, "I am seeking to have my spouse, [Junior,] adopt this child in order to provide this child with the legal stability of two parents"; "I understand that this means [Junior] will become a legal parent, with rights **equal** to my

rights as a biological parent"; "I understand that this means [Junior] will have custody rights and child support obligations to this child if we ever separate in the future"; and "I want [Junior] to become a legal parent to this child because I believe it is in the best interests of the child." Glover Aff., 12/5/2021 (emphasis in original). Junior's affidavit reflects the same plan and purpose. Even if the parties' intent were not apparent from their conduct, it was spelled out in black and white in the affidavits. Thus, the record amply supports the conclusion the parties mutually intended to conceive and raise Child together. But rather than view that intent as part of a contract between spouses, we affirm the Superior Court's holding it establishes, without more, Junior's parentage of Child.

Despite our acceptance of intent-based parentage in the ART context, we nevertheless encourage couples in similar circumstances to document their intentions in writing. While not necessarily dispositive, such writings (like the affidavits in this case) provide strong evidence of intent should a dispute arise, even if the writings do not meet the elements of a contract. We do not foreclose the possibility that partners in a couple **could** contract with each other to have a child together. But the point is that we do not require them to do so, and in any event, under this intent-based doctrine, the additional elements required by contract law need not be proved. Furthermore, we emphasize our decision today does not obviate the other paths to parentage already recognized in our case law.[30]

---

[30] For instance, ART contracts are still enforceable to establish parentage among intended parents and gamete donors or gestational carriers — since intent-based parentage is limited to resolving disputes between the intended parents, it would not suffice to establish parentage when the dispute is between the intended parents and the donors/carriers. Additionally, as *amici* GLBTQ Legal Advocates & Defenders *et al.* note, LGBTQ+ parents are often advised to complete a confirmatory adoption to ensure full faith and credit of parentage in other jurisdictions; while these parents who use ART can now rely on intent-based parentage if a dispute arises in Pennsylvania, the Court does not discourage them from taking other measures to preserve their rights in other states.

## IV.    Conclusion

For all the foregoing reasons, we adopt the doctrine of intent-based parentage into our common law, and we affirm the Superior Court's decision Junior is Child's legal parent based on that ground only.

Chief Justice Todd and Justices Donohue and Wecht join the opinion.

Justice Brobson files a concurring opinion in which Justice Mundy joins.

Justice McCaffery did not participate in the consideration or decision of this matter.